[No. B222241. Second Dist., Div. One. May 6, 2011.]

In re M.C., a Person Coming Under the Juvenile Court Law.
LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY
SERVICES, Plaintiff and Respondent, v.
IRENE V., Defendant and Appellant.

[No. B223176. Second Dist., Div. One. May 6, 2011.]

In re M.C., a Person Coming Under the Juvenile Court Law.
LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY
SERVICES, Plaintiff and Respondent, v.
MELISSA V. et al., Defendants and Appellants.

## COUNSEL

Carlson & Greenberg and John E. Carlson for Defendant and Appellant Melissa V.

Michael A. Salazar, under appointment by the Court of Appeal, for Defendant and Appellant Jesus P.

Joseph D. MacKenzie, under appointment by the Court of Appeal, for Defendant and Appellant Irene V.

Christopher Blake, under appointment by the Court of Appeal, for Minor M.C.

Andrea Sheridan Ordin, County Counsel, James M. Owens, Assistant County Counsel, and Sarah Vesecky, Deputy County Counsel, for Plaintiff and Respondent.

Robert C. Fellmeth, Elisa Weichel and Christina Riehl for Children's Advocacy Institute as Amicus Curiae.

## OPINION

### JOHNSON, J.—

#### SUMMARY

This dependency action involves the question of whether a child, born during the marriage of two women but conceived as the result of a premarital relationship between one of the women and a man, may have three presumed parents, one of whom is the child's biological mother, one of whom is the child's presumed mother because she and the child's biological mother were married when the child was born, and one of whom is the child's presumed father because he promptly came forward and demonstrated his commitment to his parental responsibilities, to the extent the biological mother and circumstances allowed. The juvenile court found the child has three presumed parents. The biological and presumptive mothers appeal, arguing the juvenile court erred when it found the father to be a presumed father. We conclude

substantial evidence supports the parentage findings, but the juvenile court's work is incomplete. The matter must be remanded for the juvenile court to resolve the conflicting presumptions of parentage.

The presumed father argues the trial court also erred when it refused to place the child in his custody, pursuant to Welfare and Institutions Code section 361.2, because he is a noncustodial, nonoffending parent. We agree the court erred in its application of section 361.2 by failing to find placement of the child in her father's custody would be detrimental to her safety, protection or physical or emotional well-being. In light of the juvenile court's failure to first resolve conflicting parentage presumptions, however, the issue of placement was and is not yet ripe for consideration, and must be resolved on remand.

## FACTUAL AND PROCEDURAL BACKGROUND

*Background prior to juvenile court intervention*

Appellant Melissa V. (Melissa) and appellant Irene V. (Irene) met in June 2006, and began living together within two weeks.[1] The relationship was stormy from the start, marked by physical and verbal abuse by both women, and allegedly peppered throughout with problems arising from Melissa's mental illness and drug and alcohol abuse.

Melissa and Irene became registered domestic partners in February 2008; they separated on May 25, 2008. During that separation, Melissa began an intimate relationship with defendant and appellant Jesus P. (Jesus). In June 2008 Melissa became pregnant with minor M.C. (or the child), and informed Jesus he was the child's father. Jesus was supportive of Melissa's pregnancy, and invited Melissa to live with him. Melissa lived with Jesus and his family for the first few months of her pregnancy. During that time, Jesus provided financial support for Melissa, and ensured that she received prenatal medical care.

On July 24, 2008, Melissa filed a petition to dissolve the domestic partnership with Irene. In conjunction with that petition, Melissa sought a temporary restraining order (TRO). In a statement filed in support of her request for the TRO, Melissa outlined incidents of abuse and physical violence Irene had allegedly committed against her between April 2007 and May 2008. The family law court issued a TRO (which was never served) against Irene on July 25, 2008.

---

[1] For the sake of clarity, and to protect the confidentiality of the child, we will refer to her by her initials and to the other parties by their first names or familial status in relation to the child (e.g., paternal grandparents).

Melissa and Irene reconciled in September 2008. Melissa told Jesus "she did not feel comfortable with him and preferred to live with Irene and that Irene had agreed to care for her and the baby," and moved out. At first, the women lived in a car. In late September they moved into an apartment. When she left Jesus, Melissa did not tell him where she would be living. She did not provide him any contact information, and did not have a phone for more than a few weeks. Melissa and Irene were married on October 15, 2008, when same-sex marriage was legal in California.

M.C. was born M.C.V. in March 2009.[2] Melissa is the only parent listed on the child's birth certificate. Irene was present at the child's birth. Melissa, Irene and M.C. lived together for about three to four weeks, until Melissa moved out taking the child with her. Jesus did not assert a right to visitation with or custody of M.C. after she was born, nor did he pay any child support. Jesus did not know where Melissa was living and made no effort to contact her through her family.

In May 2009, Irene filed a request in San Bernardino Superior Court (SBSC) for an OSC (order to show cause) regarding child custody and visitation, seeking joint legal and physical custody of M.C. Melissa opposed that request. In June 2009, Melissa obtained a restraining order in the SBSC action.[3]

In June 2009, Melissa resumed contact with Jesus, who had moved to Oklahoma in February 2009 to pursue an employment opportunity. Melissa told Jesus she had left Irene, and needed financial assistance for M.C. Jesus agreed to send her money for the child's support and, on three occasions between July and August 2009, sent $100 to Melissa through Western Union. Melissa and Jesus maintained Internet contact with one another and, at Jesus's request, Melissa regularly took M.C. to visit Jesus's family.

*Detention*

M.C. was taken into protective custody in mid-September 2009, after Melissa's new boyfriend, Jose A., attacked Irene with a knife, stabbing her in the neck and back and causing severe injuries. Melissa was arrested and charged as an accessory to attempted murder in connection with that attack.

Respondent Los Angeles County Department of Children and Family Services (DCFS) filed the instant petition, pursuant to Welfare and Institutions

---

[2] M.C. was initially given the surname Melissa shared with Irene. In June 2009, Melissa effected a legal change to the child's surname to Melissa's own name.

[3] The restraining order required Irene, among other things, to refrain from any contact with M.C. That order was supplanted by a July 2009 order issued by the Los Angeles Superior Court granting Irene weekly monitored visitation.

Code section 300, subdivisions (a) and (b). As ultimately sustained, the petition alleged the assertion of dependency court jurisdiction over M.C. was warranted because Irene, Melissa's spouse and the child's presumed mother, and Melissa had a history of domestic violence, and that Melissa was incarcerated and had a history of substance abuse.[4]

In its detention report DCFS detailed what it then knew about M.C.'s background. It reported that Melissa and Irene were married, but had separated and were currently getting divorced. Melissa noted that Irene was not on the child's birth certificate and had not legally adopted M.C. Melissa told DCFS her relationship with Irene had always been violent. They fought often and, occasionally, both of them ended up with black eyes. The maternal grandmother echoed Melissa's statement. The maternal grandmother said Melissa and Irene had lived with her family for about six months in 2008. The relationship was volatile; Irene and Melissa fought at least once a week. The maternal grandparents wanted M.C. placed with them.

Melissa told DCFS Jesus was M.C.'s biological father, and that he was living somewhere in Oklahoma. She (untruthfully) said she had not been in contact with Jesus since M.C.'s birth, and had no information about him.

According to information obtained from the police, Melissa and Jose were driving in Melissa's car on September 21, 2009, and saw Irene board a bus. Jose got on the same bus and befriended Irene. Jose later bought a beer for Irene, and they sat in a park to drink. As Irene rose to leave, Jose stabbed her in the neck and back. Irene saw Jose run away and get into Melissa's car. Irene was taken to the hospital in critical condition.

Police officers contacted Melissa, who came to the police station. At first, Melissa denied any involvement in the stabbing. She told the interviewing officer she and Jose had been at home all day, smoking marijuana; M.C. was with them. Melissa was left in an interview room equipped with a telephone, and called Jose. She did not know she was being taped. The transcript of that recording reflects that Melissa told Jose, among other things, that she had covered for him, had told police she did not know his last name and "that bitch got what she deserved." Later, Melissa admitted to police she and Jose had followed Irene. They had planned for Jose to confront Irene and scare her to "make sure she doesn't come to court and to back off and stay away from [Melissa's] baby." Melissa said she and Jose wanted to scare Irene, but if scaring her did not work they would use physical violence. When Jose returned to the car after attacking Irene, he told Melissa "things went bad."

---

[4] The petition also contained allegations regarding Jesus's neglect of and failure to provide support for M.C. (Welf. & Inst. Code, § 300, subds. (b), (g).) Those allegations were ultimately stricken.

Melissa admitted she and Jose smoked methamphetamines in the car with M.C. in the backseat, and routinely used drugs in front of the child.

A DCFS social worker met with Irene at the hospital. Irene, who was medicated at the time, told DCFS she had not legally adopted M.C. because she did not think she needed to since she and Melissa were married. She said that she currently had an order permitting her to visit M.C. every other weekend, but had not seen the child in four months.[5] Irene did not know Jesus, and later told DCFS she believed Melissa had only had a fleeting relationship with him.

At the detention hearing the court found Irene to be M.C.'s "presumed mother" pursuant to marriage, found Melissa to be the child's biological mother and found Jesus to be an "alleged father." M.C. was placed in shelter care.

*Interim reports*

After meeting with Irene in early October 2009, DCFS reported that she lacked transportation, and was unemployed and receiving general relief and food stamps. Irene lived with Maria C., Irene's mother's former companion, and Maria's daughter. The two-bedroom apartment lacked beds or an operative refrigerator. Irene slept on a sofa, and Maria and her daughter slept on mattresses on the floor. Irene could not live with her own mother, because her mother was involved in her own ongoing dependency action, and her other children were detained in permanent placement. In addition to the unsuitable physical environment, DCFS was reluctant to place M.C. in Irene's care because she remained injured and unable to care for the baby, and there was a chance she might be attacked again, as Jose remained at large.

DCFS determined that, with a few physical changes and the vacation from the home by a maternal uncle, the maternal grandparents' home would be a suitable physical environment in which to place the child. M.C.'s maternal grandfather, who had recently retired, was available to care for her during the day.

*Jurisdiction and disposition*

DCFS's jurisdiction/disposition and supplemental reports contained Melissa's, Irene's and Jesus's responses to the allegations of the petition and additional information. Melissa told DCFS she and Irene had engaged in physical

---

[5] Irene later disavowed this statement, claiming it was made under heavy sedation, and said she had regularly been visiting M.C.

violence throughout their relationship, including incidents during which Irene struck her with a closed fist, and kicked and pushed her. The final incident occurred in May 2009 when Melissa returned to their home to retrieve belongings, and Irene pushed her into a closet and a window. The women did not engage in any physical violence during Melissa's pregnancy or in front of the child. Melissa also told DCFS she had been diagnosed with bipolar disorder and severe depression when she was 13 years old, had battled depression throughout her life, and had been involuntarily hospitalized several times due to suicidal ideations.

With regard to Irene's stabbing, Melissa said she had not wished to kill or harm Irene and had not known what Jose did. She said she and Jose followed Irene because they "just wanted to scare her. [Melissa] did not want her visiting with the baby and [she] wanted for her to stop fighting for custody of [M.C.]" Melissa said her attempts to reconcile with Irene had been futile; they simply continued to argue. She told DCFS Irene did not provide financial support for M.C., and that Irene had not been emotionally supportive when they lived together—she had seldom held the child and became easily irritated when the infant cried.

Melissa denied telling the police she had used methamphetamines the day Irene was stabbed, denied any methamphetamine use since high school, and denied she had ever been under the influence of drugs or alcohol in front of her child. She did admit that she had a significant history of drug abuse in the past, and that she continued regularly to drink and smoke marijuana.

With respect to the allegation regarding Jesus's failure to provide for the child's care, Melissa told DCFS he "can't provide he is in Oklahoma." But she said he had sent money for the child's support through Western Union. She also said Jesus had been supportive of her pregnancy, was supportive after M.C.'s birth and had never denied paternity. Melissa said she had lived with Jesus and his family for the first four months of her pregnancy.

In response to the allegations of domestic violence, Irene admitted she fought with and yelled at Melissa, but adamantly denied ever having hit her. When asked about specific instances in 2006 (involving a thrown hammer), and in 2008 (after which Melissa had been treated at a hospital), Irene claimed that the first instance had been Melissa's doing, and the latter had occurred after a drunken Melissa fell down a set of stairs. Irene said Melissa "had a history of fabricating stories and making false accusations against people." Irene told DCFS that she had used methamphetamines when she was in high school. Irene admitted drinking alcohol on occasion, but denied any current alcohol or drug abuse. Regarding Jesus, Irene told DCFS she believed he was only a "one night stand and that [Melissa] had no contact with him."

Irene acknowledged that the demise of her relationship with Melissa was for the best, but said she believed she would continue to coparent M.C., and was committed to securing a safe and nurturing home for the child.

DCFS was able to conduct a telephonic interview of Jesus in Oklahoma by mid-October 2009. He said Melissa told him her entire relationship with Irene had involved physical violence, and he had never understood why she went back to Irene. As far as the drug abuse allegations, Jesus thought "Melissa smoked marijuana."

Jesus denied the allegation that he failed to provide for M.C. He told DCFS he and Melissa met over the Internet, and became intimate a few days after they met. Shortly thereafter, Melissa became pregnant. When that happened, Jesus took Melissa into his home, provided for her financially and made sure she went to her doctor's visits. He told DCFS he had always intended "to be father to the baby no matter what," irrespective of his relationship with Melissa. When Melissa moved out to return to Irene, she told Jesus she "did not feel comfortable with him and preferred to live with Irene," who had agreed to care for her and the baby. Melissa did not tell Jesus where she was going, and did not provide him with any of her contact information. In February 2009, Jesus moved to Oklahoma, where he remains, after receiving an offer for full-time employment. Jesus was engaged to be married, and he and his fiancée were expecting a child.

Jesus did not try to contact Melissa after she moved out. He did not hear from her until June 2009, when she called him to say she and Irene had split up, and she needed money for the baby. Jesus agreed to send Melissa money on a regular basis to care for M.C., and he began to send her funds on a regular basis.[6] Since that time, Jesus has maintained contact with Melissa through the Internet, and she began taking the baby to visit his family.

Jesus told DCFS he is employed as an assistant produce manager at a grocery store, has stable and adequate housing and the support of his immediate family, including his fiancée and the child's paternal grandmother to help care for the child. Jesus said he is "prepared to care for his child and provide her with a loving and nurturing home." DCFS contacted the child protective service agency in Oklahoma and requested that a courtesy visit be made to assess Jesus's home for possible safety concerns or hazards. The Oklahoma agency refused to assess Jesus's home absent a court order to do so.

---

[6] In response to a request by Melissa's attorney, Jesus submitted a declaration of paternity in June 11, 2009, in the divorce proceeding to assist Melissa in her effort to defeat Irene's attempt to obtain shared custody of and visitation with M.C.

The maternal grandparents wanted M.C. placed in their care. At the time, however, DCFS had lingering concerns about the wisdom of such a placement.

Based on its investigation, DCFS recommended that the juvenile court sustain the petition, find Jesus to be M.C.'s presumed father and order an Interstate Compact on the Placement of Children (ICPC; Fam. Code, § 7900 et seq.) in Oklahoma for Jesus.

On October 26, 2009, the juvenile court found Jesus to be M.C.'s biological father. The court took DCFS's recommendation that Jesus be declared the child's presumed father under submission, and ordered DCFS again to try to facilitate a courtesy assessment of Jesus's home through the Oklahoma agency. The parties were ordered to submit briefs addressing whether a biological father could be elevated to the status of presumed father under Family Code section 7611, subdivision (d), based on visitation between paternal family members and the child. The matter was set for a contested adjudication.

In January 2010, Melissa, who remained incarcerated, submitted on the petition's jurisdictional allegations.

A supplemental report by DCFS prepared for the jurisdictional hearing noted both the paternal and maternal grandparents regularly visited M.C., and the visits went well. The foster mother said both grandmothers were loving and affectionate with the baby and provided her excellent care. Irene also had monitored visits with M.C. twice weekly, for two hours. Although she was usually late for the visits, or ended them early, Irene behaved appropriately during the visits and the foster mother reported no problems.

A team decisionmaking meeting was conducted in late January 2010; Irene, Jesus, the paternal grandmother, the maternal grandparents and DCFS representatives attended. Everyone there agreed that, for the time being, the most appropriate placement for M.C. was the home of her maternal grandparents. DCFS noted Jesus maintained contact with his mother in order to stay abreast of how M.C. was doing. Monitored visits were arranged for Jesus and M.C. while he was in California. Jesus told DCFS that he and his fiancée, who was then four months pregnant, lived in a two-bedroom apartment. They were planning to buy a home and to marry in July after their child was born. Jesus was willing to do whatever was necessary or asked of him in order to have his daughter released to his care. Jesus's fiancée told DCFS she would help in any respect, and was willing to care for M.C. if the child was released to Jesus's care.

The two-day jurisdictional hearing began on January 29, 2010. Irene testified. At the conclusion of the hearing, the petition was modified and sustained. The matter was continued to February 5, 2010, for a ruling on paternity and disposition.

In a "Last Minute Information," submitted prior to the continued hearing, DCFS recommended the court terminate its jurisdiction and grant joint legal custody to Melissa and Jesus, vesting Jesus with sole physical custody, and giving Melissa and Irene monitored visitation. If the court was not inclined to release M.C. to Jesus's care, DCFS recommended the child be placed with her maternal grandparents, that Jesus be found to be a presumed father and given monitored visits when in California, and that both Melissa and the presumed mother Irene be granted monitored visitation and reunification services.

At the conclusion of the hearing, the juvenile court found Jesus to be M.C.'s presumed father, Irene to be the child's presumed mother and Melissa to be the biological mother. The court declared M.C. a dependent of the juvenile court, placed her in the care of her maternal grandparents under DCFS's supervision and ordered reunification services for all three parents. Jesus and the paternal grandmother were given unmonitored visitation, and DCFS was given authority to permit Jesus to have overnight visits. Irene was given monitored visits, as was Melissa, once DCFS verified visits were safe and appropriate at her place of incarceration. The court ordered DCFS to initiate an ICPC for Jesus in Oklahoma.

Irene appeals from the jurisdictional, parentage, dispositional, and removal orders. Melissa filed an appeal from the parentage, removal and dispositional orders. Jesus appeals from the dispositional order and the order that an ICPC be completed as to him.[7]

## DISCUSSION

The principal issue on appeal concerns the juvenile court's novel finding that M.C. has three presumed parents—a biological presumed mother, a statutorily presumed mother and a constitutionally presumed father under *Adoption of Kelsey S.* (1992) 1 Cal.4th 816 [4 Cal.Rptr.2d 615, 823 P.2d 1216] (*Kelsey S.*). Melissa and Irene insist the juvenile court erred when it found Jesus to be M.C.'s presumed father. Jesus, not surprisingly, contends that finding was correct, but maintains the court erred when it refused immediately to place M.C. in his custody, and in requiring an ICPC with the State of

---

[7] Jesus also appealed the order finding Irene to be a presumed mother, but his opening brief does not address the issue, which we deem waived. M.C. appears only as a respondent. We also granted leave for the Children's Advocacy Institute to appear as amicus curiae.

Oklahoma. M.C. and the amicus curiae contend, essentially, that the trial court's ruling affording presumed parent status—and the concomitant rights, privileges and protections that attach thereto—to Melissa, Irene and Jesus, may (as argued by M.C.) or should (as urged by the amicus curiae) be affirmed.

Before turning to the merits, some background is helpful.

## 1. *Parentage*

The Uniform Parentage Act (UPA), Family Code section 7600 et seq.,[8] provides the statutory framework for judicial determinations of parentage, and governs private adoptions, paternity and custody disputes, and dependency proceedings. (*Adoption of Michael H.* (1995) 10 Cal.4th 1043, 1050 [43 Cal.Rptr.2d 445, 898 P.2d 891] (*Michael H.*); *In re Jesusa V.* (2004) 32 Cal.4th 588, 603 [10 Cal.Rptr.3d 205, 85 P.3d 2] (*Jesusa V.*).)

■ Under the dependency law scheme, only mothers and presumed parents have legal status as "parents," entitled to the rights afforded such persons in dependency proceedings, including standing, the appointment of counsel and reunification services. (*In re Zacharia D.* (1993) 6 Cal.4th 435, 451 [24 Cal.Rptr.2d 751, 862 P.2d 751] (*Zacharia D.*); *In re Emily R.* (2000) 80 Cal.App.4th 1344, 1354 [96 Cal.Rptr.2d 285].) In an appropriate case, a man or a woman who is not a child's biological parent may be deemed his or her "presumed parent." (*Jesusa V., supra*, 32 Cal.4th at p. 606; *In re Nicholas H.* (2002) 28 Cal.4th 56, 58–59 [120 Cal.Rptr.2d 146, 46 P.3d 932] (*Nicholas H.*); *Elisa B. v. Superior Court* (2005) 37 Cal.4th 108, 119–120 [33 Cal.Rptr.3d 46, 117 P.3d 660] (*Elisa B.*).)

■ Under the UPA, the parent-child relationship between a child and his or her natural mother is presumptively established, most often and easily, "by proof of her having given birth to the child." (§ 7610, subd. (a).)

Establishing a father's status is often more difficult. Nevertheless, the need to establish a father's status in a dependency proceeding is pivotal; it determines the extent to which he may participate in the proceedings and the rights to which he is entitled. (*In re Christopher M.* (2003) 113 Cal.App.4th 155, 159 [6 Cal.Rptr.3d 197].)

The UPA distinguishes between "alleged," "biological," and "presumed" fathers. (*Francisco G. v. Superior Court* (2001) 91 Cal.App.4th 586, 595–596 [110 Cal.Rptr.2d 679].) "A man who may be the father of a child, but whose

---

[8] Statutory references are to the Family Code unless otherwise indicated.

biological paternity has not been established, or, in the alternative, has not achieved presumed father status, is an 'alleged' father. [Citation.]" (*Zacharia D., supra*, 6 Cal.4th at p. 449, fn. 15.) "A biological or natural father is one whose biological paternity has been established, but who has not achieved presumed father status . . . ." (*Ibid.*)

"Presumed father status ranks highest." (*In re Jerry P.* (2002) 95 Cal.App.4th 793, 801 [116 Cal.Rptr.2d 123] (*Jerry P.*).) Presumed fathers are vested with greater parental rights than alleged or biological fathers. (*Zacharia D., supra*, 6 Cal.4th at pp. 448–449.) "[O]nly a presumed . . . father is a 'parent' entitled to receive reunification services under [Welfare and Institutions Code] section 361.5," and custody of the child under Welfare and Institutions Code section 361.2. (*Zacharia D.*, at p. 451; see *Jerry P., supra*, 95 Cal.App.4th at p. 801.)

 Section 7611 sets forth several rebuttable presumptions under which a man may qualify as a presumed father, two of which are pertinent here. They are: if the man is or has been married to the child's mother and the child is born during (or soon after) the marriage (§ 7611, subd. (a)), or the man "receives the child into his home and openly holds out the child as his natural child" (§ 7611, subd. (d)). "The statutory purpose [of section 7611] is to distinguish between those fathers who have entered into some familial relationship with the mother and child and those who have not. [Citation.]" (*In re Sabrina H.* (1990) 217 Cal.App.3d 702, 708 [266 Cal.Rptr. 274]; see *In re T.R.* (2005) 132 Cal.App.4th 1202, 1209 [34 Cal.Rptr.3d 215] (*T.R.*).) "[A] man who has neither legally married nor attempted to legally marry the mother of his child cannot become a presumed father unless he *both* 'receives the child into his home *and* openly holds out the child as his natural child.' (§ 7611, subd. (d), italics added.) . . . Therefore, to become a presumed father, [an unwed biological father] must not only openly and publicly admit paternity, but must also *physically* bring the child into his home." (*Michael H., supra*, 10 Cal.4th at p. 1051.)

An alleged father has the burden to establish, by a preponderance of the evidence, the foundational facts supporting his entitlement to presumed father status, i.e., that he received the child into his home and openly and publicly acknowledged paternity. (*In re Spencer W.* (1996) 48 Cal.App.4th 1647, 1652–1653 [56 Cal.Rptr.2d 524] (*Spencer W.*).) If the alleged father establishes this foundation and it is challenged, the statutory presumption may be rebutted in an appropriate action only by clear and convincing evidence. (§ 7612, subd. (a); *T.R., supra*, 132 Cal.App.4th at p. 1210; *Nicholas H., supra*, 28 Cal.4th at p. 63.)

 An unwed father may also, under narrow circumstances, assert constitutional paternity rights, even though he does not qualify under a statutory

presumption under section 7611. (*Kelsey S., supra,* 1 Cal.4th at p. 849; *In re J.L.* (2008) 159 Cal.App.4th 1010, 1018 [72 Cal.Rptr.3d 27] (*J.L.*); *Gabriel P. v. Suedi D.* (2006) 141 Cal.App.4th 850, 860 [46 Cal.Rptr.3d 437].) Such a quasi-presumed, or "*Kelsey S.*" father as they are most commonly known, is an unwed biological father who comes forward at the first opportunity to assert his paternal rights after learning of his child's existence, but has been prevented from becoming a statutorily presumed father under section 7611 by the unilateral conduct of the child's mother or a third party's interference. (*In re Elijah V.* (2005) 127 Cal.App.4th 576, 583 [25 Cal.Rptr.3d 774] (*Elijah V.*).)

The principles regarding the presumptions of paternity also have been applied with equal force to a woman seeking presumed mother status. (*In re Karen C.* (2002) 101 Cal.App.4th 932, 938 [124 Cal.Rptr.2d 677] (*Karen C.*); *In re Salvador M.* (2003) 111 Cal.App.4th 1353, 1357 [4 Cal.Rptr.3d 705] (*Salvador M.*); see *Elisa B., supra,* 37 Cal.4th at pp. 119–120 [citing *Karen C.* and *Salvador M.* with approval]; *Johnson v. Calvert* (1993) 5 Cal.4th 84, 90 [19 Cal.Rptr.2d 494, 851 P.2d 776] [statutory "provisions applicable to the father and child relationship" shall be used to determine a mother and child relationship "insofar as practicable"].)

We review a juvenile court's determination of presumed parentage status under the substantial evidence standard. (*Charisma R. v. Kristina S.* (2009) 175 Cal.App.4th 361, 368–369 [96 Cal.Rptr.3d 26], disapproved on another ground in *Reid v. Google, Inc.* (2010) 50 Cal.4th 512, 532, fn. 7 [113 Cal.Rptr.3d 327, 235 P.3d 988]; *Jerry P., supra,* 95 Cal.App.4th at p. 819; *Spencer W., supra,* 48 Cal.App.4th at p. 1650; but see *In re Kiana A.* (2001) 93 Cal.App.4th 1109, 1116 [113 Cal.Rptr.2d 669] (*Kiana A.*) [determination of presumed father status reviewed under abuse of discretion standard].) "[W]e review the facts most favorably to the judgment, drawing all reasonable inferences and resolving all conflicts in favor of the order. [Citation.] We do not reweigh the evidence but instead examine the whole record to determine whether a reasonable trier of fact could have found for the respondent. [Citation.]" (*Spencer W., supra,* 48 Cal.App.4th at p. 1650.)

Increasingly, as aptly illustrated here, the complicated pattern of human relations and changing familial patterns give rise to more than one legitimate claimant to the status of presumed parent, and the juvenile court must resolve the competing claims. As the Supreme Court explained in *Jesusa V.,* "[a]l-though more than one individual may fulfill the statutory criteria that give rise to a presumption of paternity, 'there can be only one presumed father.' [Citations.]" (*Jesusa V., supra,* 32 Cal.4th at p. 603.) The procedure for reconciling competing presumptions is set forth in section 7612. It provides that: "(a) . . . a presumption under Section 7611 is a rebuttable presumption

affecting the burden of proof and may be rebutted in an appropriate action only by clear and convincing evidence. [¶] (b) If two or more presumptions arise under Section 7610 or 7611 that conflict with each other, or if a presumption under Section 7611 conflicts with a claim pursuant to Section 7610, the presumption which on the facts is founded on the weightier considerations of policy and logic controls." (See also *Jesusa V.*, at p. 603.)

M.C. and the amicus curiae invite us to employ this case as a vehicle to highlight the inadequacies of the antiquated UPA to accommodate rapidly changing familial structures, and the need to recognize and accommodate novel parenting relationships. We agree these issues are critical, and California's existing statutory framework is ill equipped to resolve them. But even if the extremely unusual factual circumstances of this unfortunate case made it an appropriate action in which to take on such complex practical, political and social matters, we would not be free to do so. Such important policy determinations, which will profoundly impact families, children and society, are best left to the Legislature. The Supreme Court has yet to decide " 'whether there exists an overriding legislative policy limiting a child to two parents' " (*Elisa B., supra*, 37 Cal.4th at p. 118, fn. 4, quoting *Sharon S. v. Superior Court* (2003) 31 Cal.4th 417, 427, fn. 6 [2 Cal.Rptr.3d 699, 73 P.3d 554]). To date, the Supreme Court has rejected the concept of dual paternity or maternity where such recognition would result in three parents: "[W]hat we considered and rejected in *Johnson* was the argument that a child could have three parents: a father and two mothers." (*Elisa B., supra*, 37 Cal.4th at p. 118; see also *Jesusa V., supra*, 32 Cal.4th at p. 603 ["[a]lthough more than one individual may fulfill the statutory criteria that give rise to a presumption of [parentage], 'there can be only one presumed father' "]; *Johnson v. Calvert, supra*, 5 Cal.4th at p. 92 [a child may have only one natural mother]; *Kristine H. v. Lisa R.* (2005) 37 Cal.4th 156, 166 [33 Cal.Rptr.3d 81, 117 P.3d 690].) We are bound by this authority. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455 [20 Cal.Rptr. 321, 369 P.2d 937] [decisions of the Cal. Supreme Court "are binding upon and must be followed by all the state courts of California"].)

Moreover, the reasons M.C. and the amicus curiae urge judicial recognition of extended parental relations illustrate why such recognition could be unwise here, even if it were possible. In the abstract, it is not difficult to opine a child might be well served by judicial recognition and preservation of a relationship with three legal "parents," all of whom love and care for her, and each of whom has evinced a commitment to providing her a safe and stable family environment. This is not that case.

Here we have a child who was detained as an infant and who has never found safety or stability with any individual claiming parental status. The

biological mother has a lengthy history of drug and alcohol abuse and serious emotional disturbance or mental illness, has never been capable of providing her daughter a stable home and will, in all likelihood, never be able to do so within the time allotted her under dependency law in light of her involvement in an attack on her ex-wife's life.

The presumed mother likely developed a superficial attachment, at best, to M.C. when the newborn lived with her for three weeks. If Melissa is to be believed, Irene rarely held the infant when they lived together, and became irritated when the baby cried. Thus, the child may never have begun to form an early attachment to Irene. While Irene has begun consistently to visit M.C., she has never occupied a parental role in the child's life. Her relationship with M.C. cannot, at least on this record, approach the level of a parent-child relationship the state seeks to protect in dependency actions. (*Jesusa V., supra*, 32 Cal.4th at p. 609.) And, it is questionable whether Irene will be able to pull her own life together within the legally allotted time to allow such a relationship with M.C. to flourish. Irene has significant issues related to domestic violence to address before she can be deemed a suitable caretaker, she resides in inappropriate housing, and lacks parenting skills, employment and transportation. Nor is there any "family relationship" to preserve here, as the fleeting marriage during which the child was born no longer exists, and the marital partners agree there is no chance of reconciliation. "[T]he [parental] presumptions are driven by state interest in preserving the integrity of the family and legitimate concern for the welfare of the child." (*Steven W. v. Matthew S.* (1995) 33 Cal.App.4th 1108, 1116 [39 Cal.Rptr.2d 535].)

Finally, although viewed against the backdrop of the two women, Jesus appears to be the most stable and capable "parent" available to M.C., we cannot ignore the fact that he made no attempt to forge a parent-child bond with M.C. before this dependency proceeding began. Even since, on this record, he appears to have remained a relative stranger to M.C., not by choice, but by virtue of physical distance and his inability to spend more time with his daughter during this pivotal bonding period of her life. Clearly the juvenile court afforded Jesus presumed father status with the hope he will be able to build the parental relationship with M.C. he now lacks. But, as the facts demonstrate, this is not a case about reunifying or preserving a familial relationship between a child and her biological or presumed parent or parents. It is about creating an opportunity to build a familial relationship where no family has ever existed. As such, even if it were our role to do so, we would deem this an inappropriate action in which to attempt to resolve issues of such substantial statewide importance.

With that in mind, we turn to the merits.

### a. *Melissa's status as M.C.'s natural mother*

██ Under the UPA, the parent-child relationship between a child and his or her natural mother is established "by proof of her having given birth to the child." (§ 7610, subd. (a).) No one disputes Melissa's presumptive status as M.C.'s biological or natural mother.

### b. *Irene is M.C.'s statutorily presumed mother*

According to section 7611, a man is presumed to be the natural father of a child if, as pertinent here, "(a) He and the child's natural mother are or have been married to each other and the child is born during the marriage . . . . [¶] . . . [¶] (d) He receives the child into his home and openly holds out the child as his natural child." (§ 7611, subds. (a), (d).) The statute is written in masculine form but, where it is practicable to do so, the statutory presumptions regarding parentage apply equally to women. (*Johnson v. Calvert, supra,* 5 Cal.4th at p. 90; *Elisa B., supra,* 37 Cal.4th at pp. 119–120; *Karen C., supra,* 101 Cal.App.4th at p. 938; *Salvador M., supra,* 111 Cal.App.4th at p. 1357.)

The party seeking to establish presumed parent status bears the burden of proof by a preponderance of evidence. (*Glen C. v. Superior Court* (2000) 78 Cal.App.4th 570, 585–586 [93 Cal.Rptr.2d 103]; *Spencer W., supra,* 48 Cal.App.4th at p. 1652.) The statutory presumption of parentage is a rebuttable presumption that affects the burden of proof. If the presumption applies, it "may be rebutted in an appropriate action only by clear and convincing evidence." (§ 7612, subd. (a).)

Melissa and Irene were married when M.C. was born. In addition, Melissa, M.C. and Irene lived in the same home for a few weeks after the child was born. Irene claims she and Melissa planned to raise the child together as a family, or to coparent even if they were not together. She considers herself M.C.'s parent, and claims to have spent every day with the child after she was born until Melissa moved out, and always to have held out M.C. as her natural child although she has provided no support for M.C. since Melissa left. Evidence of the circumstances of the relationship between Irene and the child during the period between M.C.'s birth and Melissa's departure is sparse. It is, however, undisputed the three people shared a home for a few weeks. It is also undisputed that Irene took steps, even before this action was initiated, to obtain custody of and visitation with M.C., and that, once she was permitted to see the child, her visits were consistent and appropriate. Applying the UPA in a gender-neutral fashion, the juvenile court concluded Irene qualified as a "presumed mother" under both section 7611, subdivision (a), due to the marital presumption, and subdivision (d), because she had received M.C. into her home and openly held her out as her natural

child. No one seriously disputes either finding.[9] The evidentiary support for the finding under subdivision (d) is relatively weak, but uncontradicted. In any event, Irene satisfies the statutory requirements as a presumed mother under section 7611, subdivision (a).

### c. *Jesus is a quasi-presumptive father*

#### (i) *Jesus is not a presumed father under section 7611, subdivision (d)*

Jesus cannot qualify as a statutorily presumed father. He never married or attempted to marry Melissa, so section 7611, subdivision (a) is clearly inapplicable. To qualify under section 7611, subdivision (d), Jesus must have "receive[d] the child into his home and openly [held] out the child as his natural child." There is no question that, since he learned Melissa was pregnant, Jesus consistently and openly held out M.C. as his natural child. He opened his home to Melissa, supported her financially during the first four months of her pregnancy, told his family she was pregnant with his child, and ensured that she received prenatal medical care.

When Melissa moved out, she cut off contact with Jesus until June 2009 when she sought financial help for M.C. from him. Jesus immediately responded to Melissa's request, and began providing minimal financial support. Jesus also signed a declaration acknowledging that M.C. was his biological child in connection with Melissa's divorce proceeding and responded affirmatively to Melissa's request to change M.C.'s last name,

---

[9] The issue of whether Irene qualifies as a statutorily presumed mother is not before us. We note, however, that another court may be called upon to address whether a gender-neutral reading of the UPA is a "practicable" application, in light of the fact that the primary statutory goal is to determine "paternity," not "parentage."

For example, under section 7540, "the child of a wife cohabiting with her husband, who is not impotent or sterile, is conclusively presumed to be a child of the marriage." As M.C. points out, a gender-neutral reading of this statute, which presumes a husband is capable of impregnating his wife, would be absurd as applied to a same-sex cohabiting couple. It is similarly difficult to imagine what legitimate purpose would be served by a voluntary declaration of "parentage"—as opposed to a declaration of "paternity"—under section 7570, as it stands now. The clear purpose of such declarations is to establish *paternity*, not just for purpose of providing the child access to benefits, but also to provide knowledge of the child's medical and genetic history, which may be necessary for purposes of his or her medical diagnoses and treatment. In light of the rapidly changing nature of familial relationships, few if any of which were on the horizon at the time the UPA was adopted in 1975, we agree the Legislature would be wise to expand the concept to include, for example, the lesbian couple where one partner or spouse is impregnated through an anonymous sperm donation, or the gay male couple where a surrogate carries to term the child of one partner or spouse. But, as it stands now, a declaration of "parentage" under the UPA is not encompassed within the statutory scheme.

months before this dependency action began. Jesus arranged for M.C. to visit his parents on a regular basis, so she could establish a relationship with her paternal relatives. In addition, when DCFS contacted him about this action, Jesus immediately proclaimed his intention to parent M.C., and expressed his desire to have M.C. placed in his custody and care. He appeared at every court hearing thereafter, travelling from Oklahoma to do so, during a period when he was not yet entitled to vacation leave at his new job.

Although Jesus argues he should be found a presumed father pursuant to section 7611, subdivision (d), the trial court correctly concluded he does not qualify under that section. Jesus, who has lived in Oklahoma all of M.C.'s life, never "received" M.C. into his own home. M.C.'s visits and contact with paternal relatives are not sufficient to satisfy this requirement. Section 7611, subdivision (d) does not apply unless a child has been physically present for some period of time in his or her father's home; "constructive receipt" is not sufficient. (*In re Tanis H.* (1997) 59 Cal.App.4th 1218, 1229 [69 Cal.Rptr.2d 380].)

### (ii) *Jesus is a* Kelsey S. *father*

Although he does not qualify as a statutorily presumed father, the juvenile court did find Jesus to be a presumed father under *Kelsey S.* based on the facts outlined above. That conclusion was correct.

*Kelsey S.* was a private adoption case in which an unwed father was prevented from taking the child into his home, and thereby prevented from becoming a presumed father under the predecessor version of section 7611, subdivision (d).[10] In *Kelsey S.*, the biological father sought custody of the infant within two days of its birth. (*Kelsey S., supra,* 1 Cal.4th at p. 822.) About the same time, the child's mother placed the baby with prospective adoptive parents. The trial court issued a TRO awarding custody and control to the father. The father, however, was not able to take custody because the prospective adoptive parents secretly removed the child from their home. The TRO was mooted a few days later, when the court ordered the child into the custody of his mother, and prohibited visitation by either the father or the prospective adoptive parents. The father was later permitted to visit the child at the shelter where the child was living with his mother. (*Id.* at pp. 821–822.) In the subsequent adoption proceeding, the court ruled the father was not a presumed father under section 7611, subdivision (d)'s predecessor statute because he had never physically taken the child into his home. Thus, the baby was free to be placed for adoption without the father's consent, if adoption

---

[10] The provisions of section 7611 regarding presumed father status are substantively unchanged from the predecessor statute, Civil Code former section 7004.

was in the child's best interest. The trial court found adoption was in the child's best interest and terminated the father's parental rights. (1 Cal.4th at p. 823.) The appellate court affirmed. (*Ibid.*)

The Supreme Court reversed. It held that section 7611, subdivision (d) "and the related statutory scheme violates the federal constitutional guarantees of equal protection and due process for unwed fathers to the extent that the statutes allow a mother unilaterally to preclude her child's biological father from becoming a presumed father and thereby allowing the state to terminate his parental rights on nothing more than a showing of the child's best interest. If an unwed father promptly comes forward and demonstrates a full commitment to his parental responsibilities—emotional, financial, and otherwise—his federal constitutional right to due process prohibits the termination of his parental relationship absent a showing of his unfitness as a parent." (*Kelsey S., supra*, 1 Cal.4th at p. 849, italics omitted.)

*Kelsey S.* protection applies to "an unwed father [who] promptly comes forward" and sufficiently and timely demonstrates "a full commitment to his parental responsibilities." (*Kelsey S., supra*, 1 Cal.4th at p. 849.) According to the Supreme Court, "[o]nce the father knows or reasonably should know of the pregnancy, he must promptly attempt to assume his parental responsibilities as fully as the mother will allow and his circumstances permit." (*Ibid.*)

*Kelsey S.* was not a dependency action. But the vast majority of appellate courts to have considered the issue have had no difficulty extending its holding to dependency proceedings. (See *In re Baby Boy V.* (2006) 140 Cal.App.4th 1108, 1117 [45 Cal.Rptr.3d 198]; *Jerry P., supra*, 95 Cal.App.4th at p. 797; *In re Andrew L.* (2004) 122 Cal.App.4th 178, 191–193 [18 Cal.Rptr.3d 591]; *In re Julia U.* (1998) 64 Cal.App.4th 532, 541–542 [74 Cal.Rptr.2d 920]; *In re William K.* (2008) 161 Cal.App.4th 1, 11 [73 Cal.Rptr.3d 737]; *J.L., supra*, 159 Cal.App.4th at pp. 1022–1024; but see *In re Vincent M.* (2008) 161 Cal.App.4th 943, 957–958 [74 Cal.Rptr.3d 755] [refusing to extend *Kelsey S.* in the context of a dependency proceeding after reunification period expired].)

In *Zacharia D.*, although the Supreme Court stopped short of applying *Kelsey S.* in that dependency action, the court acknowledged that "[e]xtending *Kelsey S.* to apply in the dependency context would allow such a father to participate as a 'parent' in, or end the need for, the dependency proceedings." (*Zacharia D., supra*, 6 Cal.4th at p. 451.)[11] The court noted that, in a dependency proceeding, the issue might arise as to "whether the statutory

---

[11] The court found the father failed to demonstrate a parental commitment to the child and that his efforts to become a presumed father were not thwarted by the child's mother or a third party. (*Zacharia D., supra*, 6 Cal.4th at p. 451.)

distinctions between biological and presumed fathers are unconstitutional as applied to a biological father who is precluded from attaining presumed father status by the mother or a third party, but who comes forward early in the dependency process, and who displays a commitment consistent with the standard set forth in *Kelsey S.*" (*Zacharia D.*, at p. 451.) In keeping with our prior decisions and the weight of authority, we find *Kelsey S.* applies in the dependency context, affording such parents quasi-presumptive status, equivalent to presumed parent status under section 7611. In short, "a father asserting valid *Kelsey S.* rights may effectively qualify for presumed father status as the result of his constitutional right to parent, which overrides any contrary statutory direction." (*J.L., supra,* 159 Cal.App.4th at p. 1023.)

■ To satisfy the *Kelsey S.* criteria, a child's biological father must show he promptly stepped forward to assume full parental responsibilities for his child's well-being, the child's mother or some third party thwarted his efforts to assume his parental responsibilities, and that he demonstrated a willingness to assume full custody of the child. (*Kelsey S., supra,* 1 Cal.4th at p. 849.) In deciding whether an individual biological father qualifies, the court instructed juvenile courts to consider "all factors relevant to that determination. The father's conduct both *before and after* the child's birth must be considered. Once the father knows or reasonably should know of the pregnancy, he must promptly attempt to assume his parental responsibilities as fully as the mother will allow and his circumstances permit. In particular, the father must demonstrate 'a willingness himself to assume full custody of the child—not merely to block adoption by others.' [Citation.] A court should also consider the father's public acknowledgement of paternity, payment of pregnancy and birth expenses commensurate with his ability to do so, and prompt legal action to seek custody of the child." (*Ibid.*)

We agree Jesus satisfies the requirements of a *Kelsey S.* father. From the time he learned Melissa was pregnant, he held himself out as M.C.'s father. He believed the child was his biological child and told others Melissa was pregnant with his child. Melissa lived with him the first four months of her pregnancy. He acknowledged paternity to Melissa, his family and his fiancée, financially provided for Melissa for a time and ensured that she received prenatal care. He told DCFS he had always intended to be a father to M.C., regardless of the nature of his relationship with Melissa. It was beyond Jesus's control that Melissa left him to return to her volatile relationship with Irene. She did not tell Jesus where she was moving, or leave him any contact information. But, once Melissa renewed contact in June 2009, Jesus responded promptly and began providing support for M.C. He maintained

communications with Melissa until she was imprisoned, expressed his desire to be part of M.C.'s life and facilitated arrangements so his daughter could begin to know her paternal relatives. When the dependency action was initiated, Jesus came from Oklahoma to attend each hearing and continued to fight for custody of M.C.

Arguably, Jesus might have expended more effort to maintain ties with Melissa throughout her pregnancy, acted sooner to establish his paternity by seeking to have his name on M.C.'s birth certificate, or made an effort to visit M.C. after she was born. But the law does not require Jesus to do everything he possibly can. Rather, he is required to "promptly attempt to assume his parental responsibilities as fully *as the mother will allow and his circumstances permit.*" (*Kelsey S., supra*, 1 Cal.4th at p. 849, italics added.) The juvenile court implicitly found Jesus was operating under the financial, time and distance constraints of a new job in another state and his commitment to his pregnant fiancée in Oklahoma, which prevented him from coming to California as often as he might otherwise have done, at least until he was entitled to vacation time.

Moreover, it was Melissa who left Jesus without any information about how to reach her, and Melissa who lost her phone within weeks of the time she left him. Irene had a phone, but she did not know Jesus, nor make any effort to contact him. She did not want Jesus—whom she believed to have been a one-night stand—involved in her life with Melissa and the baby. According to Irene, the two women planned to raise M.C. together as a family; Jesus was not part of that plan. Thus, the court could reasonably conclude Melissa's unilateral actions in leaving Jesus and refusing to provide contact information, combined with Irene's inaction and the constraints created by Jesus's finances and distance from his child, contributed to the circumstances preventing Jesus from establishing his status as a presumed father. While Jesus might have hunted Melissa down, and forcefully interjected himself into the relationship between Melissa and Irene, it is also possible to conclude he chose not to do so, and instead decided to allow an emotionally fragile woman the space she needed so that she could return to a relationship in which she felt "more comfortable," and complete her pregnancy as free from stress as possible.[12]

---

[12] Melissa and Irene argue Jesus could have acted earlier to establish his paternity judicially. The record reflects that, when M.C. was less than two months old, Melissa's attorney contacted Jesus to inform him that she was working to establish Jesus's paternity and obtain a judgment so Irene would have no parental rights with respect to M.C. Jesus cooperated in that endeavor, and signed a declaration acknowledging paternity and consenting to the child's name change. At that time, Jesus believed his interests and Melissa's were aligned, and that there was nothing more he needed to do to establish paternity. Jesus may have been naïve, but his actions were not unreasonable at the time.

*Under the circumstances* of this action, the juvenile court found that Jesus acted reasonably, promptly and consistently demonstrated his intention to make the fullest commitment as his circumstances permitted to fulfill his parental responsibilities. (*Kelsey S., supra,* 1 Cal.4th at p. 850.) Substantial evidence supports the juvenile court's conclusion that Jesus is a *Kelsey S.* father, and occupies a status equivalent to that of a statutorily presumed parent. (*J.L., supra,* 159 Cal.App.4th at pp. 1023–1025.)

### 2. The juvenile court must weigh the conflicting presumptions

We are left with three individuals claiming legal status as parents: a biological mother (pursuant to § 7610), a statutorily "presumed mother" (pursuant to § 7611, subds. (a) & (d)), and the constitutional equivalent, a *Kelsey S.* father. Only two of these individuals may retain that status. A juvenile court faced with conflicting claims of presumed parentage must apply section 7612 to determine which presumption controls. (*Elijah V., supra,* 127 Cal.App.4th at p. 584.)

Section 7612, subdivision (a) provides that "in an appropriate action" certain presumptions of parenthood "may be rebutted" by clear and convincing evidence. This provision vests the trial court with discretion to determine as a threshold matter whether the case is an appropriate one in which to entertain a challenge to an individual's status as a putative presumed parent. An "appropriate" action includes one "in which another candidate is vying for parental rights . . ." and seeks to rebut another candidate's status as presumed parent in order to perfect his or her own claim. (*Nicholas H., supra,* 28 Cal.4th at p. 70; see *Jesusa V., supra,* 32 Cal.4th at p. 606, fn. 5.) If the action is an appropriate one in which to entertain a challenge to an individual's presumptive or claimed parental status, clear and convincing evidence may rebut that status. If there is no clear evidence that a candidate is unfit to retain his or her status, the analysis must proceed under section 7612, subdivision (b). Under that subdivision, if two or more presumptions arising under section 7610 or 7611 conflict with each other, or a presumption arising under section 7611 conflicts with a claim of parentage under section 7610, "the presumption which on the facts is founded on the weightier considerations of policy and logic controls." (§ 7612, subd. (b).)[13]

---

[13] We conclude that, for purposes of resolving conflicting presumptions under section 7612, subdivision (b), a *Kelsey S.* father is the equivalent of a statutorily presumed father. Any other conclusion would render *Kelsey S.* status meaningless.

*Amy G. v. M.W.* (2006) 142 Cal.App.4th 1 [47 Cal.Rptr.3d 297], held that section 7612, subdivision (b) did not provide a mechanism to resolve a challenge brought by a woman claiming presumed mother status under section 7611 to another woman's conflicting claim of biological maternity arising under section 7610, subdivision (a). (142 Cal.App.4th at p. 14.) *Amy G.* was abrogated by an amendment to section 7612, subdivision (b) expanding the

Here, no individual claiming parental status has been shown by clear and convincing evidence to be unfit to retain his or her status. The juvenile court declined to weigh the presumptions, content to leave M.C. with three presumed parents. While we empathize with the desire to leave all options open, particularly in a case such as this in which, at least at the time the parentage determination was made, no available choice was optimal, that conclusion was improper. The court's ruling was not wrong—as far as it went. M.C. does have three presumed parents, a situation the Supreme Court has acknowledged may exist. (*Elisa B., supra,* 37 Cal.4th at p. 119; *Jesusa V., supra,* 32 Cal.4th at p. 603.) But the juvenile court must take the next step to reconcile the competing presumptions to determine which of them are founded on the weightier considerations of policy and logic. The Supreme Court has stated clearly that, "[a]lthough more than one individual may fulfill the statutory criteria that give rise to a presumption of [parentage], 'there can be only one presumed father.' " (*Jesusa V., supra,* 32 Cal.4th at p. 603.) To date, the Supreme Court continues to reject the notion of dual paternity or maternity where its recognition would result in three parents. (*Elisa B., supra,* 37 Cal.4th at pp. 118–119 [stating the court has "considered and rejected . . . the argument that a child could have three parents: a father and two mothers"]; *Kristine H. v. Lisa R., supra,* 37 Cal.4th at p. 166.)

This conclusion is implicit in the court's finding that all three parents were entitled to retain their presumptive status. That conclusion would have been unwarranted had evidence demonstrated any candidate clearly unfit to be a legal parent. We defer to the trial court if substantial evidence supports its factual determination. (*Charisma R. v. Kristina S., supra,* 175 Cal.App.4th at pp. 368–369.) Accordingly, the matter must be remanded to the juvenile court to resolve the conflicting fact-intensive presumptions as between the three parents under the standard articulated in section 7612, subdivision (b), and in view of circumstances as they have developed since the parentage determination was made in February 2010.

3. *Juvenile court's refusal to place M.C. with Jesus under Welfare and Institutions Code section 361.2*

Jesus argues that, because he is a nonoffending, noncustodial parent, the juvenile court erred when it refused to place M.C. immediately in his care in

---

resolution mechanism to encompass conflicts between claims arising under section 7610 or 7611, or between a section 7611 presumption and a claim to parentage under section 7610. (Stats. 2008, ch. 534, § 1.)

Oklahoma as required by Welfare and Institutions Code section 361.2 (section 361.2).

Welfare and Institutions Code section 361.2 provides, in pertinent part, that: "(a) When a court orders removal of a child pursuant to Section 361, the court shall first determine whether there is a parent of the child, with whom the child was not residing at the time that the events or conditions arose that brought the child within the provisions of Section 300, who desires to assume custody of the child. If that parent requests custody, the court shall place the child with the parent unless it finds that placement with that parent would be detrimental to the safety, protection, or physical or emotional well-being of the child."

Under Welfare and Institutions Code section 361.2, placement of the dependent child with a nonoffending, noncustodial parent must be the juvenile court's first priority if that parent requests the placement. (*In re Adrianna P.* (2008) 166 Cal.App.4th 44, 55 [81 Cal.Rptr.3d 918]; *In re V.F.* (2007) 157 Cal.App.4th 962, 973 [69 Cal.Rptr.3d 159].) If it refuses to make such a placement under section 361.2, the juvenile court must find, by clear and convincing evidence, that it would be detrimental to the child to give custody to the noncustodial parent. (*In re John M.* (2006) 141 Cal.App.4th 1564, 1569 [47 Cal.Rptr.3d 281].) This standard is extremely high, and it was not met here where the juvenile court refused to place M.C. with Jesus, not because it found that to do so would be detrimental to M.C., but because such a placement would jeopardize the child's interest in reunification with Irene. The fact that a child's reunification with another presumed parent may become more difficult, or even much more difficult, is not, itself, sufficient to support a finding, by clear and convincing evidence, that it would be detrimental to place the child with an out-of-state presumed parent. (*Id.* at p. 1570.) Rather, the detriment must relate to the child's safety, or similar concerns, and the burden is on DCFS to demonstrate the danger.[14]

But, the issue of M.C.'s placement under Welfare and Institutions Code section 361.2 is not ripe for either juvenile court or appellate consideration until the juvenile court resolves the conflicting parental presumptions pursuant to section 7612, subdivision (b). On remand, if after resolving the conflicting presumptions, Jesus retains his status as presumed father, the

---

[14] In light of the remand, we deem Jesus's claim that it was improper for the court to order an ICPC moot. The juvenile court has a duty to be sure Jesus's home is safe. The Oklahoma agency refused to assist the court without a court order. Accordingly, the court had no reasonable means to obtain the information it required short of ordering the ICPC. In any event, even if the ICPC was not necessary, no harm was done and, presumably, the investigation of Jesus's home has been completed and will provide useful information.

juvenile court is to conduct a new placement hearing using the appropriate standard under section 361.2. (*In re V.F., supra*, 157 Cal.App.4th at p. 974.)

## DISPOSITION

The order finding that M.C. has three presumed parents is incomplete and, as such, is reversed. The matter is remanded for the juvenile court to complete its inquiry and weigh the competing parentage presumptions in accordance with the factors articulated in Family Code section 7612, subdivision (b).

Chaney, J., concurred.

**ROTHSCHILD, Acting P. J.,** Concurring and Dissenting.—I agree with the majority that Jesus is a presumed father under *Adoption of Kelsey S.* (1992) 1 Cal.4th 816 [4 Cal.Rptr.2d 615, 823 P.2d 1216] (*Kelsey S.*), and I accordingly concur in part 1.c.(ii) of the majority's Discussion. I dissent from the remainder of the majority's Discussion, however, because I find it either unnecessary to our decision or incorrect on the merits.

As the majority acknowledges, no party challenges the presumed parent status of either Melissa V. or Irene V. Therefore the issue is not before us. Because we should consequently express no opinion on it, I do not join part 1.a. and b.

The majority correctly concludes that Jesus is a presumed father under *Kelsey S.* As a result, the majority's further conclusion that Jesus is not a presumed father under Family Code section 7611, subdivision (d), is unnecessary and adds nothing to the opinion, so I do not join part 1.c.(i).

Part 2. of the majority's discussion, in contrast, is necessary, but I disagree with it. At the hearing on February 5, 2010, the trial court could and should have reduced the number of presumed parents from three to two. To do that, the court first could and should have determined whether one of the presumptions was rebutted by clear and convincing evidence under Family Code section 7612, subdivision (a), and then, if three presumed parents still remained, the court could and should have resolved the conflicts among the three presumptions by determining which two are "founded on the weightier considerations of policy and logic" under Family Code section 7612, subdivision (b). Had the court done so, and had the court either found Jesus's presumption rebutted at the first step or resolved the conflicting presumptions against Jesus at the second, we would have been compelled to reverse,

because the record contains no evidence that would support such an outcome. Moreover, we would have directed the trial court on remand *to find that Jesus's presumption was not rebutted and to resolve the conflicts in his favor*; we would not have remanded for further proceedings and the taking of additional evidence *as to Jesus*. There is consequently no reason to remand for further proceedings and the taking of additional evidence as to Jesus in this case—he should not be worse off because the trial court failed to rule at all than he would have been if the court had ruled against him. We should therefore direct the trial court to find that Jesus's presumption was not rebutted[1] and to resolve the conflicts in his favor.

Because of my disagreement with part 2. of the majority's opinion, I disagree with part 3. as well. At the hearing on February 5, 2010, the trial court should have reduced the number of presumed parents from three to two, and Jesus should have been one of the two. If the trial court had reached that result, or if we were correcting its failure to do so by directing it to reach that result on remand, then there would be no question about whether Jesus will, at the end of the day, "retain[] his status as presumed father." (Maj. opn., *ante*, at p. 224.) Accordingly, there should have been no impediment to application of Welfare and Institutions Code section 361.2 at the hearing on February 5, 2010, and there is no impediment to our applying it now. Moreover, as the majority correctly states, the standard for refusing Jesus's request for placement under that statute "was not met here" (maj. opn., *ante*, at p. 224)—the record before the trial court at the hearing contained *no evidence* that placement with Jesus "would be detrimental to the safety, protection, or physical or emotional well-being of the child." (Welf. & Inst. Code, § 361.2, subd. (a).) (In her respondent's brief, M.C. agrees that the order denying placement with Jesus under Welf. & Inst. Code, § 361.2 "must be vacated as lacking any basis whatsoever.") We should therefore direct the trial court to place M.C. with Jesus forthwith.[2]

To summarize: At the hearing on February 5, 2010, the trial court could and should have reduced the number of presumed parents from three to two. Had the court done so, it would have had no basis for concluding that Jesus was not one of the two. And, had the court concluded that Jesus *was* one of the two, the court would likewise have had no basis to refuse to place M.C. with Jesus under Welfare and Institutions Code section 361.2. On this appeal,

---

[1] The majority concludes that the trial court has already implicitly determined that no presumptions were rebutted.

[2] Such a placement would not prevent the court from continuing to safeguard M.C.'s interests. For example, the court could order that Jesus's custody of M.C. be subject to the continuing jurisdiction or supervision of the court. (Welf. & Inst. Code, § 361.2, subd. (b)(2), (3).)

decided in May 2011, we should direct the trial court to do what it should have done on February 5, 2010. M.C. has been separated from Jesus for too long already, and continuing delays do not benefit her. I therefore respectfully dissent.