Filed 12/19/13  In re I.O. CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re I.O., a Person Coming Under the Juvenile Court Law. | |
| ALAMEDA COUNTY DEPARTMENT OF SOCIAL SERVICES,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>J.O.,<br><br>        Defendant and Appellant. | A134887, A135684<br><br>(Alameda County<br>Super. Ct. No. HJ11016436) |

## I.  INTRODUCTION

In this consolidated appeal, Father, J.O., challenges the juvenile court's orders of February 6, 2012, and May 8, 2012, denying his Welfare and Institutions Code[1] section 388 petitions and, in the case of the May 8, 2012, order, the termination of his parental rights to his biological son, I.O.  In addition, he contends that because he was not given proper notice of his right to file a writ to challenge the court's March 24, 2011, order setting the section 366.26 hearing, he is challenging that order as well.  He also argues that counsel's failure to appeal from orders issued on November 3, 2011, and December

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise noted.

1

16, 2011, denying two additional section 388 petitions constituted ineffective assistance of counsel.

In addition to his appeals from these five orders, Father further argues that the trial court erred in failing to inquire in a timely and thorough way into I.O.'s paternity and also had a duty to ensure that Father completed a Declaration of Paternity, a duty it failed to carry out.  Finally, he similarly argues that counsel was ineffective for failing to obtain a paternity test in a timely fashion and in failing to ensure that he completed a Declaration of Paternity.  We find that none of these arguments has merit and affirm the orders appealed from.

## II.  FACTUAL AND PROCEDURAL BACKGROUND

### A.    *Dependency Petition*

I.O. first came to the Agency's attention on February 14, 2011, when he was taken into protective custody after his mother left him with his 18-year old aunt without any provision for his care.  He was 10 months old.  On February 16, 2011, the Agency filed a dependency petition alleging that after the police took I.O. into protective custody, they were unable to locate Mother, who led a transient lifestyle, had a prior history of methamphetamine use and had a child in 2007 who was also detained and, eventually, adopted.  When Mother was located, she exhibited mental health issues that made her unable to care and provide for I.O.

At the time, Father, who at this point the Agency was referring to as the "alleged" Father, was incarcerated in Nevada, and unable to care for I.O.  Father was given notice by certified mail of I.O.'s detention on February 24, 2011.

The court held a detention hearing on February 17, 2011.  At that time, the court appointed counsel for Mother and Father.  The question of paternity was deferred after Mother refused to answer any of the court's questions about I.O.'s paternity.  The court detained I.O., who was placed with a foster family.

### B.    *Jurisdiction and Disposition Report*

In its jurisdiction and disposition report filed March 4, 2011, the Agency reported that Mother had refused contact and that "[t]he issue of paternity needs to be resolved.

2

The mother refuses to answer questions as to the father's identity. Relatives state that [Mother] named [Father] as the father to [I.O.]. It is unknown whether he is on the birth certificate for [I.O.]. The paternal side of the family is seeking to do a paternity test as they question whether [Father] is the father to [I.O.]." I.O.'s paternal relatives had been in contact with the Agency and intended to "get paternity testing prior to any commitment of father status." I.O. was in a foster home where he was doing well. The Agency recommended that no services be offered to Mother or Father.

**C.** *March 24, 2011 Jurisdictional Hearing*

At the March 24, 2011, jurisdictional hearing, Father appeared by counsel. Father's counsel submitted the matter on the report. Mother was not present but was represented by counsel. The court noted that at the last hearing Mother had appeared. The court found the allegations of the petition true, and adjudged I.O. a dependent. I.O. was placed with a foster parent and the court found, with regard to visitation rights to grandparents, that there were "no grandparents whose whereabouts are known at this time." The court denied reunification services to Mother pursuant to section 361.5, subdivision (b) (10), (11), and (13). The court also held that "[t]he Agency is not required to provide reunification services to [Father] because he is an alleged father unless and until he establishes a legal basis for receiving those services." The court scheduled a section 361.5, subdivision (g) assessment for May 9, 2011, and a section 366.26. hearing for July 18, 2011.

The court's minute order of March 24, 2011, was served that same day on Father at the address in Winnemucca, Nevada, where he was then incarcerated and on Father's counsel. No writ was filed challenging the court's order.

**D.** *May 2, 2011 Due Diligence Memo*

In its May 2, 2011, due diligence memo, the Agency reported on its unsuccessful efforts to locate Mother. Father, who was referred to as I.O.'s "alleged father," was located in the Nevada Correction System and personally served with notice of the section 366.26 hearing.

**E.** *May 10, 2011, Order for Paternity Testing*

In a minute order entered May 10, 2011, the court ordered the Agency to provide Father with paternity testing. On June 15, 2011, Father's attorney received the results of the paternity testing, which proved that Father was I.O.'s biological father.

**F.** *July 1, 2011, Section 388 Petition*

Two weeks later, on July 1, 2011, father filed his first of four section 388 petitions. In this first petition, he sought to vacate the scheduled July 18, 2011, section 366.26 hearing. Father requested that the court instead "order the minor placed with the paternal family and to order six months of reunification services to the father." In the petition Father noted that Father's sister and mother now sought to have I.O. placed with them and had completed a successful home evaluation. In addition, I.O.'s paternal grandmother had been assessed as a "fit and capable caregiver" for I.O.

In his declaration in support of the section 388 petition, Father's attorney stated that on April 29, 2011, he was informed that Father's mother and sister had contacted a social worker about having I.O. placed with them. They were told that a paternity test was necessary to determine whether Father was I.O.'s biological father. After Father's paternity was determined, Father sent him a Form JV-505 Statement Regarding Parentage, which counsel attached to his declaration.

Counsel contended that it would be in I.O.'s best interest to be placed in the home of either I.O.'s paternal grandmother or aunt, both of whom "are committed to the wellbeing of the minor, and seek to provide the minor with a safe, nurturing, and loving home."

In his Statement Regarding Parentage, Father disclosed that he had told two of his sisters and his mother that he believed he was I.O.'s father. In addition, he listed three activities in which he had participated with I.O. These were "naming my son," "also advis[ing] the mother to have [I.O.] circumcised" and "verbally assist[ing] the mother in choosing daycare for [I.O.]." Father attached a handwritten sheet in which he stated that he did not become aware that Mother was pregnant until he was incarcerated. He then became involved in I.O.'s life as best he could while in prison. He named him, and was

4

"there for moral, mental, and emotional support for his mother.  I even went [so] far as setting up a support system for the mother by giving her the names, numbers, and addresses of my immediate family and encouraging her [Mother] to call on them whenever she needed to or felt the need to."  He stated that Mother had, in fact, taken I.O. to meet his sisters.  Mother then agreed to give temporary custody of I.O. to Father's sisters while she " '[got] back on her feet.' "  However, instead,  I.O. was dropped off at the Fremont Police Department.  Father asked that I.O. be placed with his family until his release on November 7, 2011.

Father also stated that he had "provided some funds from my inmate account" and "[h]ad friends and family members send diapers and wipes on my behalf."

In an order dated July 6, 2011, the court set a hearing on Father's section 388 petition for July 18, 2011.  It did so because it found that "the best interest of the child may be promoted by the request."

## G.　*Agency's July 1, 2011, Section 366.26 Report*

The Agency's report prepared for the July 18, 2011, section 366.26 hearing, which was to be heard on the same day as Father's section 388 petition, was filed on July 1, 2011.  At that time, the Agency requested a 30-day continuance.  The Agency reported that on June 28, 2011, I.O.'s paternal grandmother told the social worker that I.O. had Native American heritage, although she did not know which tribe.  The Agency had noticed the Bureau of Indian Affairs.

After Father's paternity test showed him to be I.O.'s father, the social worker arranged a visit with I.O. and his grandmother for June 29, 2011.  The day before the meeting, the paternal grandmother cancelled the visit "due to car[] problems."  According to the Agency, grandmother "indicated that she and her daughters had discussed the matter, and if they were unable to get [I.O.], would be satisfied that he be adopted by the current caregivers.  They would like to have a role in [I.O.'s] life.  [Father's] exact position is currently unknown to the Agency.  However [the social worker] has not yet ruled out the paternal family as potential relative adoptive parents at this writing, pending their actual firm decision as to whether they wish to pursue [I.O.] being placed with any

5

of them.  The family members would need to indicate a firm commitment and begin the assessment process.  Should they not do so by an agreed upon date, the current caregivers are more than willing to adopt [I.O.]."

The Agency reported that I.O. "appears to be developing an appropriate relationship with his caregivers, and easily seeks them out for comfort,  reassurance, and nurturing."  It noted that Father "wishes to have reunification services and obtain custody of his son.  [Father's] family members are initiating contact with the Agency now that they know Mr. [O.] is the father of [I.O.].  The position of the biological relatives regarding [I.O.] has yet to be determined at this writing."

**H.**     *July 18, 2011, Hearing*

At the July 18, 2011, hearing Father was represented by counsel, as was Mother. Neither Father nor Mother appeared.  At that time, counsel for the Agency requested a continuance of the section 366.26 hearing  for the reasons set out in the Agency's report.

With regard to Father's section 388 petition, the Agency argued that there was no prima facie case to justify holding a hearing on the petition.  The court noted the Agency's objection to the petition and informed the parties that "[m]y inclination is to put all of this over to whatever hearing date we pick.  And I'll make the appropriate determination at that point."

**I.**     *August 25, 2011, Hearing*

On August 25, 2011, the Agency argued that the section 388 petition should be summarily rejected because there was no showing that granting it would be in I.O.'s best interest.  Counsel for Father contended that the court had already found that he had made a prima facie case because it had set the matter for a hearing.  The court stated that its understanding was that although the court may find, based on the "paperwork," that a prima facie case was made "there are circumstances under which the Court can review that and reverse that decision."  The court then continued the matter to November 3, 2011, to "again entertain the arguments as to whether or not a prima facie case [has] been made and we'll decide whether or not the Court will have a full hearing on the 388.  If the Court decides that it will have the 388 hearing, it will be on that date."

6

**J.**     *October 19, 2011, Report for Continued Section 366.26 Hearing*

In its report prepared for the continued section 366.26 hearing, the Agency recommended that adoption be selected as the permanent plan, with no reunification services for Father.

The Agency reported that in a letter dated September 28, 2011, Father "indicated that he may not be released from prison on 10/26/11, as he had anticipated. He reports completing an 8 week Domestic violence program. [Father] . . . also acknowledges receipt of the pictures of [I.O.] that [the social worker] has sent to him. [Father] wishes strongly to have a chance to get to know [I.O.] and do whatever is deemed necessary by the Agency or the Court such that he can have [I.O.] in his custody."

I.O. continued to thrive in his proposed adoptive parents' home. In the meantime, Mother had given birth to another child, who had been placed in the home with I.O.

I.O.'s paternal relatives had two visits with I.O. and cancelled three.

The Agency stated that I.O. "has received the benefit of a loving, consistent and stable home with people who are committed to his permanent well-being to the point of wanting to adopt him. He is living with a half-sibling that he can grow up with. Neither birth parent has been available to him in any way, for differing reasons. They have not formed a parental relationship with [I.O.], nor has any relationship been possible. [Father] coming forward is highly commendable, and he appears sincere in his desire to become a father to [I.O.]. However, it is [I.O.'s] best interests that have to be considered at this point. To deny him permanency with the only stable family he knows, on the chance that [Father] will rapidly and successfully complete all the requirements of a Reunification program, is against the best interests of a young child."

**K.**     *November 3, 2011, Order Denying Father's July 1, 2011, Section 388 Petition*

Father was present by telephone at the hearing on his section 388 petition on November 3, 2011. Mother was also present at the hearing and was represented by counsel. With regard to the section 388 petition, counsel argued that the fact that father had been determined to be I.O.'s biological father was a "huge change of circumstance." I.O.'s counsel contended that Father's identification as I.O.'s biological father was

significant. Counsel further stated that "if the court is making any ruling that's the ruling that the court should be making in either granting or denying the motion if it's determining whether he's been able to elevate himself to presumed father."

The court denied Father's petition as follows: "[T]here is a two-prong test that the Court must apply in determining whether or not a prima facie showing has been made in order to have a 388 hearing. As has been indicated by the parties, the first prong of that test is whether or not there's been change of circumstances or new evidence. The second prong is, and this is and, these two go hand [in] hand. There must be the first prong and there must be the second prong. Second prong is the best interest of the child may be promoted by the proposed change of the order. [¶] There have been changed circumstances as counsel points out in terms of the paternity test and the results of that showing that [Father] is the biological father. But the second prong, the Court believes has not been met and that is the best interest of the child may be promoted by a change of the order, and the Court does not see that it is in the best interest of the child to change the order. [¶] Couple of things that the Court recognizes in this case and that's that [Father] is the biological father only. He's not a presumed father. He has not even met the child. He didn't even realize that the child existed until after at some point in time he was told that mother was pregnant with his child, but he's been incarcerated. At the time of his incarceration . . . he was not aware of the fact that the mother was pregnant with the child, and there's been no bond established at all between [Father] and the child here. [Father] apparently indicates that he has had some change in his ways but the court can't rely on that representation. The child has never seen, been touched, been held by [Father] and the Court cannot see at this point that it would be in this child's best interest to change the previous order of the Court."

Father's counsel then argued that the Court's proposed ruling was a violation of Father's constitutional due process rights to terminate Father's parental rights unless it was shown that he was an unfit parent.

The court denied Father's petition and continued the section 366.26 hearing to November 10, 2011. Father did not appeal from the court's denial of his petition.

8

**L.** *November 9, 2011, Section 388 Petition*

On November 9, 2011, Father filed a second section 388 petition. In it, he explicitly asked the court to find that he was I.O.'s presumed father and order six months of reunification services. This request was "[b]ased on the father's demonstrated commitment to the minor, particularly the fact that he held the child out to his family as his child, provided for the financial support of the minor, participated in important early decisions for the child, such as naming, childcare and circumcision, and came forward requesting a paternity test to prove parentage of the child . . . ."

The November 10, 2011, hearing was continued to December 1, 2011. Father's counsel requested that Father be granted visitation on those occasions when Father's mother visited I.O. The court denied this request, noting that Father's request for presumed father status had not yet been heard.

At the December 1, 2011, hearing, counsel for Father argued that the section 388 petition before the court differed from the earlier petition he had filed because Father was now asking, based on changed circumstances, that the court grant him presumed father status and six months of reunification services. In a discussion of the matter of Father's parental status, Father's counsel stated that early in the matter "mother . . . refused to engage the Court . . . . The Court sought to do a paternity voir dire. The mom refused to answer any of the Court's questions, got up, and walked out. There was never any information regarding paternity." The court noted that it did recall the paternity inquiry and, given the circumstances, it would consider Father's section 388 motion.

The court then conducted a paternity inquiry. At that time, Mother identified Father as I.O.'s biological father. She stated they had never married. Father was not at I.O.'s birth and his name was not on I.O.'s birth certificate. However, Father's birth date was on the birth certificate.

According to Mother, Father found out about her pregnancy when they were both incarcerated. She believed that Father was "going to have doubts because we weren't actually in a relationship." After I.O. was born she had contacts with Father through letters. Father chose I.O.'s name. Father told his mother and sisters about the child.

9

Father had not provided Mother any financial support but he "has been there emotionally" by writing to her. He also called and spoke to I.O. in Spanish. She sent Father pictures of I.O. She had had no contact with Father after he got out of prison. Father's family had not given her anything in support of I.O. She recalled that one of Father's sisters had given her child care supplies. Father offered his sister's help in providing Mother with child care, an offer Mother did not accept.

Father testified that he had been convicted of felony battery against the mother of his oldest child. After he completed his sentence for that conviction in California he was extradited to Nevada where he served an additional 22 months for violating his parole. Father had been in touch with the Department of Child Support Services. His child support obligation was zero.

The court ruled that it would consider the section 388 petition after the Agency submitted its objections to the petition. It deferred the determination of presumed father status as well. The court continued the section 366.26 hearing to January 27, 2012. Father was permitted to visit I.O. with his mother at a "park or public setting."

**M.** *December 16, 2011, Order Denying November 9, 2011, Section 388 Petition*

In an order filed December 16, 2011, the court denied Father's section 388 petition on the grounds that it did not "state new evidence or a change of circumstances" and "[t]he proposed change of order . . . does not promote the best interest of the child." Several days later, on December 19, 2011, the court denied Father's presumed father request, citing Family Code section 7611, *In re J.L.* (2008) 159 Cal.App.4th 1010, 1018 and *In re T.R.* (2005) 132 Cal.App.4th 1202. No appeal was filed from either of these orders.

In its report for the continued section 366.26 hearing, the Agency described Father's two visits with I.O. Both went well, with Father arriving on time, behaving appropriately and showing sensitivity to I.O.'s feelings. Father and his mother also called and spoke to I.O. on Christmas Day.

The Agency further reported that "[a]lthough [Father's] interaction appears appropriate and not detrimental to [I.O.], it occurs on the cusp of a plan of adoption by

10

the current caregivers. The father's 388 for services, as well as his request to be found presumed, have been denied by the Court. The proposed adoptive parents are willing to engage in ongoing post-adopt contact with paternal family. Another child of the mother's was born and placed in the same home, and [I.O.] is developing a sibling relationship with the new baby. The proposed adoptive parents remain committed to providing permanency to [I.O.], and adoption appears likely."

## N. *February 1, 2012, Section 388 Petition*

On February 1, 2012, Father filed another section 388 petition. He contended that new information supported a change in the court's prior orders. This information included a declaration of Father's mother describing how on September 6, 2010, October 13, 2010, and November 12, 2010, Father sent $30.00, $40.00, and $20.00, respectively, for his mother to use to provide baby supplies to Mother. He also noted that he had visited I.O. twice since the last hearing.

## O. *February 7, 2012, Order Denying Section 388 Petition*

On February 7, 2012, the court denied Father's section 388 petition on the ground that "[t]he request does not make a prima facie showing that the best interests of the child would be promoted by the change."

## P. *Agency Report for Continued Section 366.26 Hearing*

In its report prepared for the continued section 366.26 hearing, the Agency noted that Father had had another appropriate visit with I.O., that he "engages easily with [I.O.] and [I.O.] appears to enjoy their play activity. No negative emotional or behavioral aftermath is reported. [¶] The father had requested the proposed adoptive parents' phone number so that he could make direct arrangements for visitation . . . . Despite some initial anxiety on the part of the caregiver . . . the caregiver [gave] her phone number to the father." The Agency "feels that the caregivers and father are able to negotiate their own level of contact." It also noted that there appeared to be a "good level of communication" between father and his family and the caregivers.

11

**Q.** *Appeal from Court's February 6, 2012, Order Denying Father's Section 388 Petition*

On March 8, 2012, Father appealed from the court's "02/06/12 denial of request to calendar father's motion, made pursuant to W&I section 388 seeking presumed father status."[2]

**R.** *March 9, 2012, Hearing*

On March 9, 2012, the court heard testimony and argument regarding the Agency's request to terminate Mother and Father's parental rights pursuant to section 366.26.

Father testified that he was released from custody on November 6, 2011. He had two visits with I.O. in December and both went very well. He had a third visit in February which was "wonderful" and "easier" for Father emotionally because I.O. was starting to feel "normal" with him. He felt that I.O. was beginning to look to him for guidance and that a bond was developing between them.

Father stated he believes I.O. would benefit from a relationship with him "[b]ecause I'm his father. I'm his blood. I want him to be raised in an Hispanic home. I want him to know his heritage, his bloodline, his relatives. I believe he's entitled to be with his father. And I think any child, given the opportunity and the time, would benefit from being with their biological father." He stated that "we are a loving race. And we have a lot of values to share and teach him." In addition, he would pass on to I.O. his "passion for sports and cooking."

Father also believed it would be detrimental for I.O. to "be a boy growing up with questions just like I was. I think he will—it would always be in the back of his head, where was my dad. Why did he give up?"

Father's mother testified that I.O. warmed up to Father and enjoyed the first visit. Similarly, during the second visit, the two got along well and Father's mother believed that a bond was being formed.

---

[2] In fact, this order was filed on February 7, 2012.

Mother believed that I.O. would benefit from a relationship with his Father because she didn't "want [I.O.] to have the same issues my son had, not having his father in his life. My son's father not being in his life has a lot to do with my son's past behavior . . . . He will learn . . . the Spanish background. Our ancestry. He will benefit, again, like [Father] said, to love sports, like my son mentioned. Our family loves football, we're fanatics for football and baseball. . . . [I.O.] will be part of that with my son."

Jeffrey Sinnott, the child welfare worker who was the adoption worker on I.O.'s case, and had been assigned to his case in April 2011, several months after I.O. was placed with his foster parents, testified. He was present at I.O.'s first visit with Father. They played well together. "[B]y the end of the visit there was a familiarity. But a parental bond, no. I don't believe . . . there could have been a parental bond observed during that visit." In fact, in his opinion, he did not think it was possible for such a bond to be created after three visits. He believed that I.O.'s primary attachment was to his foster parents.

Following this testimony and after hearing argument from the parties about whether parental rights should be terminated, the court took the matter under submission.

At a hearing on March 14, 2012, the court announced that it had not yet reached a decision. Instead, the court asked the parties to brief "whether or not the Court should consider [Father's] imprisonment as a factor that may have made it impossible for him to come forward and assume his parental responsibilities. Should the Court consider that? Is it a factor; is it not a factor?" The court also asked the parties to brief the issue of what weight it should give to Father's actions toward I.O. and whether it was required to find Father an unfit parent before terminating his parental rights.

### S. *April 19, 2012, Section 388 Petition*

On April 19, 2012, Father filed a fourth section 388 petition. He cited as new information his testimony in court about visitation and "the developing parent-child bond between father and son. Also the child's relationship with his father and paternal grandmother, and testimony regarding the importance and benefit to the minor of the

13

father imparting his Mexican heritage & culture." Father attached a declaration in which he again restated the facts that supported his request for presumed father status (he named his son, his mother visited his son the day after his birth, he chose the daycare provider, he directed Mother to bring I.O. to visit his family, his family offered to babysit I.O. as needed; he offered his family home to Mother when she was having difficulty finding housing. While in custody, he made arrangements to send money to a friend who Father directed to buy baby supplies. Since his release from custody, Father had visited with I.O. and "[w]ith each visit, there is an increasing closeness between us. . . . A loving parent-child bond has begun to develop between us."

Father's lawyer also submitted a declaration summarizing Father's testimony, as well as that of his mother, at the previous hearing as support for Father's renewed presumed father request.

**T.** *May 8, 2012, Order Denying April 19, 2012, Section 388 Petition*

On May 8, 2012, the court ruled that Father had not "raised himself to the level of a *Kelsey S.* father." (*Adoption of Kelsey S.* (1992) 1 Cal.4th 816 (*Kelsey S.*).) The court acknowledged that Father suggested I.O.'s name and corresponded with Mother about daycare and the availability of his family to provide care. However, Father did not provide Mother with any financial support from December 2009, when he learned she was pregnant with I.O. through February 2011, when I.O. was taken into custody. The court discounted Father's evidence to the contrary, citing Mother's denial of or inability to recall receiving any support from Father and the lack of any documentation to support Father's claim. The court also denied Father's section 388 petition on the ground that there had been no real change in circumstances nor any facts to show that a change would be in I.O.'s best interests.

The court then terminated Mother and Father's parental rights and ordered adoption as I.O.'s permanent plan.

**U.** *Appeal of May 8, 2012, Order*

On May 22, 2012 Father filed a notice of appeal of the court's May 8, 2012 order. We now consider Father's consolidated appeals.

14

# III. DISCUSSION

## A. *March 24, 2011, Jurisdictional Order*

We begin our analysis of Father's appeal with the March 24, 2011, jurisdictional hearing. Father, who was at that time incarcerated in Nevada for a parole violation, and had been incarcerated since I.O.'s birth, appeared by counsel, who submitted the matter on the Agency's report. Mother was not present, but was represented by counsel.

At this point in the proceedings, Mother had refused all contact with the Agency and refused to answer questions about the identity of I.O.'s father. The Agency learned from relatives that Mother had apparently named Father as I.O.'s biological father. The Agency did not know if Father was listed as such on I.O.'s birth certificate. Moreover, Father's family questioned whether Father was, in fact, I.O.'s biological father. The Agency understood that Father's family wanted to see the results of a paternity test prior to any commitment with regard to I.O. I.O. had already been placed in a foster home where he was doing well.

The court found the allegations of the petition true, adjudged I.O. a dependent and placed him with foster parents. The court denied reunification services to mother. The court also held, with regard to Father that "[t]he Agency is not required to provide reunification services to [Father] because he is an alleged father unless and until he establishes a legal basis for receiving those services." The court then set the matter for a section 366.26 hearing.

Father did not file an extraordinary writ seeking review of the court's order. Despite the Agency's argument to the contrary, Father may, nevertheless, challenge this order because there is nothing in the record that indicates he was properly notified of his right to file a petition seeking extraordinary writ review. (§ 366.26, subd. (l)(3)(A); *In re Cathina W.* (1998) 68 Cal.App.4th 716, 718.) Accordingly, we review the court's March 24, 2011, order denying reunification services to Father under the substantial evidence standard of review. (*In re Harmony B.* (2005) 125 Cal.App.4th 831, 839-840.)

Generally, "[o]nly a presumed, not a mere biological, father is a 'parent' entitled to receive reunification services, and only a presumed father is entitled to custody of his

15

child." (*Francisco G. v. Superior Court* (2001) 91 Cal.App.4th 586, 596 (*Francisco G.*), citing *In re Zacharia D.* (1993) 6 Cal.4th 435, 451.) "In contrast, the juvenile court 'may' order reunification services for a biological father if the court determines that the services will benefit the child. (§ 361.5, subd. (a).)" (*Francisco G., supra,* 91 Cal.App.4th at p. 596.) [3]

Father, who had "neither legally married nor attempted to legally marry" Mother, had two routes to take in order to be designated as a presumed father. He could "receive[] the child into his home and openly hold[] out the child as his natural child, or . . . both he and the natural mother [could] execute a voluntary declaration of paternity." (*Francisco G., supra,* 91 Cal.app.4th t p. 595.)

Therefore, at this point in the proceedings, the court had before it only enough information to designate Father as I.O.'s alleged father. Nothing in the record indicated that Father had taken any steps toward presumed father status. Therefore, we conclude

---

[3] The *Francisco G.* court helpfully defines the other two categories of father to which the courts generally refer in determining a parent's rights as follows: "[A] 'biological' or 'natural' father is one whose biological paternity has been established, but who has not achieved presumed father status as defined in Family Code section 7611. '[A] biological father's paternal rights may ultimately be terminated in the dependency process. Such termination is almost inevitable if a father is not involved in the dependency process prior to the section 366.26 hearing.' " (*Francisco G., supra,* 91 Cal.App.4th at p. 596, citing *In re Zacharia D., supra,* 6 Cal.4th at p. 451.) Further, "[a]n 'alleged' father refers to a man who may be the father of a child, but whose biological paternity has not been established, or, in the alternative, has not achieved presumed father status. [Citation.] 'An alleged father in dependency or permanency proceedings does not have a known current interest because his paternity has not yet been established.' [Citation.] An alleged father is entitled to notice of the proceedings, which provides an opportunity for him to appear and assert a position. [Citation.] An alleged father who fails to become a party of record in the dependency court proceedings has no standing to appeal an order terminating his parental rights. [Citation.] Pursuant to section 316.2, subdivision (b), each alleged father must be provided notice that he is or could be the father of the child, that the child is the subject of proceedings under section 300, and that the proceedings could result in the termination of parental rights and adoption of the child." (*Francisco G., supra,* 91 Cal.App.4th at p. 596.)

16

that substantial evidence supports the court's March 24, 2011, order denying Father reunification services.

Implicitly acknowledging the fact that as an alleged father he was not entitled to reunification services, Father takes a different tack and instead argues that the fact his status was not quickly enough elevated to presumed father status, and thus would have resulted in his entitlement to services, is due to errors on the part of the court and his counsel. We disagree.

Father first argues that the juvenile court did not meet its statutory obligation to inquire into his paternity because the court did not order paternity testing until May 10, 2011, nearly three months after I.O. was detained. We disagree.

Under section 316.2, subdivision (a), the juvenile court is required "to inquire of the mother . . . the identity . . . of all presumed or alleged fathers . . . ." This inquiry shall occur "at the detention hearing or as soon thereafter as practicable." (*Ibid*.) Should a potential father be identified, due process requires only that the alleged father be given notice and an opportunity to appear and assert a position and attempt to change his paternity status. "Section 316.2, subdivision (b), describes the juvenile court's duties once an alleged father has been identified. It provides: '[E]ach alleged father shall be provided notice at his last and usual place of abode by certified mail return receipt requested alleging that he is or could be the father of the child. The notice shall state that the child is the subject of proceedings under Section 300 and that the proceedings could result in the termination of parental rights and adoption of the child. Judicial Council form Paternity-Waiver of Rights (JV-505) shall be included with the notice . . . .' [Citation.]" (*In re Paul H.* (2003) 111 Cal.App.4th 753, 760 (*Paul H*).)

California Rules of Court, rule 5.635(g) implements section 316.2. It provides as follows: "If, after inquiry by the court or through other information obtained by the county welfare department or probation department, one or more persons are identified as alleged parents of a child for whom a petition under section 300, 601, or 602 has been filed, the clerk must provide to each named alleged parent, at the last known address, by certified mail, return receipt requested, a copy of the petition, notice of the next

17

scheduled hearing, and Statement Regarding Parentage (Juvenile) (form JV-505) unless: [¶] (1) The petition has been dismissed; [¶] (2) Dependency or wardship has been terminated; [¶] (3) The parent has previously filed a form JV-505 denying parentage and waiving further notice; or [¶] (4) The parent has relinquished custody of the child to the county welfare department."

Our review of the record indicates that the juvenile court adhered to these statutory requirements. Father was identified as an alleged father on February 15, 2011, by Mother, a day before the petition in this matter was filed. Despite his argument to the contrary, Father was given timely and appropriate notice by certified mail at his correct address. In addition, the court appointed counsel for him on February 17, 2011.

In sum, Father was identified as a "potential father" immediately. He was given appropriate notice and was represented by counsel from the outset of this matter. The fact that Mother refused to answer questions about paternity and the court deferred its examination about this matter in light of her unwillingness to do so, does not change the fact that the requirements of section 316.2 were met and Father's interests were appropriately protected.

Father next argues that this court should impose on the juvenile court a previously unrecognized duty to "assist" Father in changing his status from alleged or biological father to presumed father by providing Father with a voluntary declaration of paternity form and apparently somehow ensuring that the form be completed. His rationale for this argument appears to be that there is a "compelling state interest in establishing paternity for all children. . . ." (Fam. Code, § 7570, subd. (a).) As Father himself acknowledges, a variety of organizations are already statutorily obligated or encouraged to offer these declarations to potential parents. (Fam. Code, § 7571, subdivision (f), (j), (k).) We see no reason to tinker with the state's comprehensive legislative scheme for determining paternity by imposing an additional duty on the juvenile courts that the Legislature has not seen fit to impose.

Finally, Father contends that counsel erred because he did not assist him in filing a Voluntary Declaration of Paternity, which would have elevated his status to that of

18

presumed father, and thus would have entitled him to reunification services. He is incorrect.

Counsel's decision to take a different route to presumed father status by filing a section 388 petition to have father recognized as a presumed father did not fall below an objective standard of reasonableness under prevailing professional norms. (*Strickland v. Washington* (1984) 466 U.S. 668, 687, 691-692.) As a tactical matter, there was every indication that locating Mother to obtain her consent to this document would be a fruitless strategy for expeditiously gaining presumed father status for Father. Specifically, at the February 17, 2011, detention hearing, Mother refused to respond to questions regarding paternity, and refused all contact with the Agency. As of May 2, 2011, the Agency was still reporting that it was unable to locate Mother. In fact, Mother did not actually appear in court until November 3, 2011. In light of these facts, we hold that counsel was not ineffective in choosing instead to seek presumed father status for Father through filing a section 388 petition.

With regard to the timing of the paternity test that revealed Father's status as biological father, we find that counsel was not ineffective for failing to secure an order for this testing earlier because no prejudice can be shown. First, a determination that Father was I.O.'s biological father was not a factor that went to his presumed father status. Moreover, Father was already represented by counsel and involved in the proceedings. Finally, although a juvenile court has discretion to order reunification services for a biological father, there is not a reasonable probability that the court would have done so. In fact, even after Father's biological status was determined, the court still declined to extend reunification services to Father. Indeed, Father, who at the time he learned that Mother was pregnant was incarcerated in California for felony domestic battery against his eldest child's mother, was hardly a candidate for discretionary reunification services. Therefore, given the absence of any prejudice, we find no ineffective assistance of counsel occurred. (*Strickland v. Washington, supra,* 466 U.S. at pp. 687, 694.)

19

**B.**     *November 3, 2011, Order Denying Father's First Section 388 Petition*

On July 1, 2011, Father filed a section 388 petition to vacate the scheduled July 18, 2011, section 366.26 hearing based primarily on the ground that a paternity test ordered by the court on May 9, 2011, showed Father was I.O.'s biological Father and his mother, as well as his sister, were now willing to have I.O. placed with either of them. Father's mother also had been assessed as a "fit and capable caregiver" for I.O. by the Agency.

Following the results of the paternity test, Father completed a Form JV-505 Statement Regarding Parentage. In this document, Father stated that he had told two of his sisters and his mother that he believed he was I.O.'s father. He had also named I.O., advised Mother about circumcision and "verbally helped her choose daycare for [I.O.]." Father stated that he did not become aware that Mother was pregnant until he was incarcerated. He then became involved in I.O.'s life as best he could while in prison. He was "there for moral, mental, and emotion support for his mother. I even went [so] far as setting up a support system for the mother by giving her the names, numbers, and addresses of my immediate family and encouraging her [Mother] to call on them whenever she needed to or felt the need to." He stated that Mother had, in fact, taken I.O. to meet his sisters. Mother then agreed to give temporary custody of I.O. to Father's sisters while she " '[got] back on her feet.' " However, instead, I.O. was dropped off at the Fremont Police Department. Father asked that I.O. be placed with his family until his release on November 7, 2011.

Father also stated that he had "provided some funds from my inmate account" and "had friends and family members send diapers and wipes on my behalf."

Counsel contended that it would be in I.O.'s best interest to be placed in the home of either his paternal grandmother or aunt, both of whom "are committed to the wellbeing of the minor, and seek to provide the minor with a safe, nurturing, and loving home."

After several continuances, the court denied Father's section 388 petition. Although it found that Father had established a change in circumstances as a result of the paternity test showing Father to be I.O.'s biological parent, the court found that I.O.'s

20

best interests would not be promoted by any change in its March 24, 2011, order denying Father reunification services and setting the matter for a section 366.26 hearing.

The court explained that Father is "not a presumed father. He has not even met the child. He didn't even realize that the child existed until after at some point in time he was told that mother was pregnant with his child, but he's been incarcerated. At the time of his incarceration . . . he was not aware of the fact that the mother was pregnant with the child, and there's been no bond established at all between [Father] and the child here. [Father] apparently indicates that he has had some change in his ways but the court can't rely upon that representation. The child has never seen, been touched, been held by [Father] and the Court cannot see at this point that it would be in this child's best interest to change the previous order of the Court." Father now argues that the court erred in so ruling.

The Agency correctly points out that Father did not appeal from this order and therefore has waived any review on appeal. Father, however, contends that counsel was ineffective in failing to file such an appeal. He is incorrect.

In order to establish ineffective assistance of counsel, Father must show two things: first, that counsel's representation fell below an objective standard of reasonableness under prevailing professional norms. Second, if he can make this showing, he must still establish that counsel's deficient performance was prejudicial, i.e., that there is a reasonable probability that, but for counsel's error, the result of the proceeding would have been different. (*Strickland v. Washington, supra,* 466 U.S. at pp. 687, 694.) We need not decide whether counsel's representation fell below an objective standard of reasonableness because Father has shown no prejudice as a result of counsel's decision not to appeal the court's order given that it is not reasonably probable that such an appeal of the court's denial of Father's section 388 petition would have been successful.

The court denied Father's section 388 petition on the ground that I.O.'s best interests would not be served by any change in its decision to deny Father reunification services based on the fact that a paternity test had established that he was I.O.'s

21

biological father.  Section 388 provides, in relevant part: "Any parent or other person having an interest in a child who is a dependent child of the juvenile court . . . may, upon grounds of change of circumstances or new evidence, petition the court . . . for a hearing to change, modify, or set aside any order of court previously made . . . ."  (§ 388, subd. (a)(1).)  Section 388 allows the juvenile court to modify an order if a party establishes, by a preponderance of the evidence, that changed circumstances or new evidence exists and the proposed change would promote the child's best interest.  (*In re Zachary G.* (1999) 77 Cal.App.4th 799, 806.)  The burden of proof is on the party bringing the petition to show that the proposed change is in the best interests of the child.  (*In re Stephanie M.* (1994) 7 Cal.4th 295, 317.)  Section 388 provides a means for the court to consider a legitimate change of circumstances, even at the permanency planning stage, that may justify a change to a prior order. (*In re Marilyn H.* (1993) 5 Cal.4th 295, 309.)  However, "[a]fter the termination of reunification services, a parent's interest in the care, custody and companionship of the child is no longer paramount.  (*In re Stephanie M., supra,* 7 Cal.4th at p. 317.)  Rather, at this point, the focus shifts to the needs of the child for permanency and stability.  [Citation.]"  (*In re Angel B.* (2002) 97 Cal.App.4th 454, 464.)  Moreover, "[i]t is not enough for a parent to show *just* a genuine change of circumstances under the statute.  The parent must show that the undoing of the prior order would be in the best interests of the child."  (*In re Kimberly F.* (1997) 56 Cal.App.4th 519, 529; § 388, subd. (b).)  Whether a prior order should be modified rests within the discretion of the juvenile court and its determination will not be disturbed on appeal absent a clear abuse of discretion.  (*In re Stephanie M., supra*, 7 Cal.4th at p. 318; *In re Kimberly F., supra,* 56 Cal.App.4th at p. 522.)

The juvenile court did not abuse its discretion when it decided that a change in the March 24, 2011, order denying Father reunification services would not be in I.O.'s best interests.  The paternity test showed Father was I.O.'s biological father and, based on this result, his mother and sister had declared themselves willing to take I.O. into their homes.  Father also provided further information about his relationship with I.O. since his birth, which mainly involved Father's declaration that he had told his family I.O. was his son,

helped name the child, made suggestions about day care and, provided Mother with some child care supplies. Father's declaration in this regard, however, was contradicted by the Agency's report that his mother and sister declined to care for I.O. until a paternity test established that he was, indeed, Father's son. The court could reasonably infer from the fact that Father's family doubted that I.O. was Father's biological son, that Father had not clearly claimed I.O. as his own child.

The court did not abuse its discretion in concluding that Father's showing was insufficient to establish that it would be in I.O.'s best interests to prolong the matter to permit Father—who had never even met I.O.—to attempt to fulfill the requirements of reunification.

Therefore, even if counsel was deficient for failing to file an appeal of the court's November 3, 2011 order, Father has shown no prejudice given that it is not reasonably probable that such an appeal would have been successful.

**C.** *December 16, 2011, Order Denying Father's Second Section 388 Petition*

On November 9, 2011, six days after the juvenile court denied his first section 388 petition, Father filed his second such petition. This petition differed from his first in that Father explicitly requested that the court grant him presumed father status and, thus, reunification services. At the December 1, 2011, hearing on this petition, Mother was present and the court conducted a paternity inquiry. At that time, Mother made a number of statements that were relevant to Father's presumed father status. Mother stated that she believed that Father was going to doubt I.O. was his child, although he had made it known that I.O. was his child, by telling his mother and sisters about I.O. With the exception of Father's sister, who had given her some child care supplies, neither Father nor his family had given her anything in support of I.O. However, Father had been emotionally supportive, had chosen I.O.'s name, had written to her from prison, called and spoken to I.O. in Spanish, and offered his family's help in providing child care for I.O. (an offer Mother did not accept).

Father testified that at the time he learned that Mother was pregnant, he was "waiting extradition back to Nevada" for a parole violation and incarcerated in California

23

for felony domestic battery against his eldest child's mother. Father had a prior conviction in Nevada in 2000 for robbery.

Although Father believed he had filed a declaration of paternity, he did not have a copy and did not know if it had actually been filed. Rather, he "requested paternity to be issued because in the State of Nevada, in the Department of Corrections, they would not perform paternity tests without court order from a proceeding . . . ."

On December 16, 2011, the court denied Father's petition on the ground that it met neither of the prongs of the section 388 test. The Agency again correctly notes that Father failed to appeal from this order and Father again argues that counsel's failure to do so constituted ineffective assistance of counsel. As with Father's earlier challenge to the court's denial of his section 388 petition, we find no error because it was not reasonably likely he would have prevailed had counsel filed an appeal.

Father's petition amounted to an explicit request for presumed father status with no new information of note from Father to justify this request, which, in any event, the court had implicitly denied in its earlier order six days earlier. Mother's testimony at the hearing to the effect that she had received little to no financial support from Father further confirmed the court's determination that Father had not met the test for presumed father status and the provision of reunification services would not be in I.O.'s best interests, given his minimal connection with I.O. The court, therefore, did not abuse its discretion in denying Father's second section 388 request. For that reason, Father cannot show prejudice from counsel's decision not to appeal from this order.

D. *February 7, 2012, Order Denying Father's Third Section 388 Petition*

On February 1, 2012, Father filed his third section 388 petition. The two pieces of information he provided the court in support of his request were (1) a declaration of Father's mother detailing three occasions on which Father sent her money to use to provide baby supplies to Mother and (2) the fact that Father had twice visited I.O. since the December 16, 2011, hearing.

The trial court did not abuse its discretion in denying this petition in an order dated February 7, 2012. The court's conclusion that Father had failed to make out a prima facie

24

showing that I.O.'s best interests would be promoted by the change is more than justified. The slim additional information provided to the court did not materially alter the court's previous conclusion that Father had not established presumed father status and a delay to provide Father with reunification services was not in I.O.'s best interests.

**E.**     *May 8, 2012, Order*

On March 9, 2012, the juvenile court heard testimony and argument regarding whether Mother and Father's parental rights should be terminated pursuant to section 366.26. Father testified about his three visits with I.O., which he believed went well, along with his belief that I.O. would benefit from a relationship with his father in that he would be raised in an Hispanic home where he would "know his heritage, his bloodline, his relatives." Father's mother testified that the visits between Father and I.O. went well and she believed they were forming a bond. In contrast, the child welfare worker testified that although Father and I.O. "played well together," no parental bond was observed. Nor did the worker think it was possible for such a bond to be created after three visits. I.O.'s primary bond was clearly with his foster parents.

The court took the matter under submission and on March 14, 2012, deferred ruling on the section 366.26 petition. Instead, the court asked the parties to brief the question of whether Father's parental rights could be terminated without a showing of his parental unfitness, pursuant to *Kelsey S., supra,* 1 Cal.4th 816.

On April 19, 2012, Father filed his fourth and final section 388 petition. The new information Father brought to the court's attention was the fact that he [Father] had had several visits with I.O. and believed there was a "developing parent-child bond" between them. Father also emphasized the importance of bringing up I.O. in a home where he would be exposed to Mexican "heritage & culture."

On May 8, 2012, the court made two separate rulings. First, the court found that Father was not a "*Kelsey S.*" father and, therefore, no finding of parental unfitness was constitutionally required prior to terminating Father's parental rights. The court also denied Father's section 388 petition on the ground that it neither presented any real change in circumstances or facts to show that a change would be in I.O.'s best interests.

25

Father appealed from this order and now argues that we should reverse it because (1) the juvenile court erred in finding he was not a *Kelsey S.* father;  (2) the termination of his parental rights without a finding of unfitness violated his federal and state due process rights; and (3) the court erred in denying his fourth and final section 388 petition.  We disagree with each of these arguments.

With regard to the court's *Kelsey S.* finding, we first address our standard of review.  Father, as "[t]he party seeking to establish presumed parent status bears the burden of proof by a preponderance of evidence."  (*In re M.C.* (2011) 195 Cal.App.4th 197, 216.)  Thus, "[t]he burden is on a biological father who asserts *Kelsey S.* rights to establish the factual predicate for those rights."  (*In re Adoption of O.M.* (2008) 169 Cal.App.4th 672, 679.)

As the court explained in *In re I.W.* (2009) 180 Cal.App.4th 1517, 1528, "where the issue on appeal turns on a failure of proof at trial, the question for a reviewing court becomes whether the evidence compels a finding in favor of the appellant as a matter of law. [Citations.]  Specifically, the question becomes whether the appellant's evidence was (1) 'uncontradicted and unimpeached' and (2) 'of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding.' [Citation.]"  Here, the evidence does not compel a finding in favor of Father as a matter of law.

In *Kelsey S.*, our Supreme Court concluded that California's statutory scheme for adoption "violates the federal constitutional guarantees of equal protection and due process for unwed fathers to the *extent that* the statutes allow a mother unilaterally to preclude her child's biological father from becoming a presumed father . . . ."  (*Kelsey S., supra,* 1 Cal.4th at p. 849.)  The court then held that "[i]f an unwed father promptly comes forward and demonstrates a full commitment to his parental responsibilities—emotional, financial, and otherwise—his federal constitutional right to due process prohibits the termination of his parental relationship absent a showing of his unfitness as a parent.  Absent such a showing, the child's well-being is presumptively best served by continuation of the father's parental relationship."  (*Ibid*.)

In order for a biological father "[t]o satisfy the *Kelsey S.* criteria, [he] must show he promptly stepped forward to assume full parental responsibilities for his child's well-being, the child's mother or some third party thwarted his efforts to assume his parental responsibilities, and that he demonstrated a willingness to assume full custody of the child." (*In re M.C., supra,* 195 Cal.App.4th at p. 220, citing *Kelsey S., supra,* 1 Cal.4th at p. 823.)  When determining whether the foregoing has been established, a "court should consider all factors relevant to that determination.  The father's conduct both *before and after* the child's birth must be considered.  Once the father knows or reasonably should know of the pregnancy, he must promptly attempt to assume his parental responsibilities as fully as the mother will allow and his circumstances permit.  In particular, the father must demonstrate 'a willingness himself to assume full custody of the child—not merely to block adoption by others.'  [Citation.]  A court should also consider the father's public acknowledgement of paternity, payment of pregnancy and birth expenses commensurate with his ability to do so, and prompt legal action to seek custody of the child." (*Kelsey S., supra,* 1 Cal.4th at p. 849, fn. omitted; see also *In re M.C., supra,* 195 Cal.App.4th at p. 220.)[4]

Here, Father did not present uncontradicted, unimpeached evidence in support of the three *Kelsey S.* requirements for presumed father status and, therefore, the court did not err in terminating his parental rights.

Father knew that Mother was pregnant with I.O. in December, 2009, more than a year before I.O. was detained.  During that period, father did not take "prompt legal action" to seek custody of I.O.  He did nothing to ensure that his status as I.O.'s father was legally recognizable.  His claim that he publicly acknowledged I.O. as his child is refuted by evidence that he merely told his mother and sisters that I.O. was his child.  This claim was also called into question by the fact that his mother and sisters refused to

---

[4] As one court observed, although *Kelsey S.* was not a dependency action, "the vast majority of appellate courts to have considered the issue have had no difficulty extending its holding to dependency proceedings." (*In re M.C., supra*, 195 Cal.App.4th at p. 219.)

give I.O. a home until paternity was established. Further, the evidence that Father provided Mother with financial support was contradicted by Mother's testimony that she did not recall him doing so beyond a single occasion. As for Father being prevented from assuming full responsibility for I.O., there is no evidence that Mother did anything to prevent him for acting as he was required to attain presumed father status. Nor was there third party intervention. Although he was in prison during much of I.O.'s life, Father's custodial status did not prevent him from legally formalizing his relationship with I.O. or taking responsibility for his care. To the extent it did, Father's incarceration was a result of Father's choices, rather than a limitation imposed on him by an external source. As the court noted in *In re Adoption of O.M., supra,* 169 Cal.App.4th at page 680, there is no "violation of equal protection or due process in holding an unwed father's own criminal activity against him when assessing whether he has met the criteria for *Kelsey S.* rights."

Because Father failed to prove the three *Kelsey S.* requirements for presumed father status, we decline to hold that such a finding should have been made as a matter of law. Therefore, the juvenile court did not err in so ordering.

Father also argues at some length that we should ignore *In re Jason J.* (2009) 175 Cal.App.4th 922, the well-reasoned opinion of our colleagues in the Fourth District, and hold that due process mandates that the juvenile court make a finding of parental unfitness before terminating a biological Father's parental rights. We decline this invitation. We agree with the *Jason J.* court that " '[a] biological father's "desire to establish a personal relationship with a child, without more, is not a fundamental liberty interest protected by the due process clause." [Citation.]' [Citation.] ' " 'Parental rights do not spring full-blown from the biological connection between parent and child. They require relationships more enduring.' [Citation.]" ' [Citation.]" (*Id.* at p. 933.) Therefore, the court was not required to make a finding of parental unfitness as Father.

## IV. DISPOSITION

The orders appealed from are affirmed.

_____
Haerle, J.

We concur:

_____
Kline, P.J.

_____
Richman, J.