Filed 7/23/21  In re Y.T. CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re Y.T.<br><br>on Habeas Corpus. | E076847<br><br>(Super.Ct.No. J273597)<br><br>OPINION |

ORIGINAL PROCEEDINGS; petition for habeas corpus.  Christopher B. Marshall, Judge.  Petition granted.

Brent Riggs, under appointment by the Court of Appeal, for Petitioner.

Michelle D. Blakemore, County Counsel, and David Guardado, Deputy County Counsel, for Respondent.

Y.T. (father), erroneously identified as J.T., appeals the December 14, 2020, order terminating his parental rights to his son, I.R., under Welfare and Institutions Code[1] section 366.26.  He also petitions for a writ of habeas corpus.  In his appeal and petition, father contends his counsel was ineffective for failing to establish his status as a *Kelsey*

---

[1] Unless otherwise indicated, all additional statutory references are to the Welfare and Institutions Code.

*S.*[2] father or seek a continuance of the 12-month review hearing to do so. We conclude

father's contention has merit. We therefore grant the relief requested in the writ petition

and dismiss the appeal as moot by separate order.

## I. PROCEDURAL BACKGROUND AND FACTS[3]

### A. *Preliminary Background Information.*

Father was introduced to mother by her nickname "Chiquita." The two were never

in a relationship; however, they had consensual sexual intercourse one time, resulting in

the birth of I.R. (born 2012). Father was not named on the birth certificate, and mother

never contacted him to inform him about I.R.'s birth or to request child support. Mother

had contact with father's brother and sister-in-law until 2015. However, father and his

brother were half-siblings who did not get along.

In September 2014, mother and her children were in a car accident in Nevada;

mother was extremely intoxicated under the influence of drugs and alcohol.[4] As a result,

---

[2] In *Adoption of Kelsey S.* (1992) 1 Cal.4th 816 (*Kelsey S.*), the California Supreme Court held that Family Code section 7611 and the related dependency statutes violate an unwed father's federal constitutional guarantees of due process and equal protection to the extent they allow a mother or third person unilaterally to preclude the father from attaining presumed father status after he, upon learning of his paternity, "promptly [came] forward and demonstrate[d] a full commitment to his parental responsibilities--emotional, financial and otherwise." (*Kelsey S.*, at p. 849.)

[3] On the court's own motion and to compile a coherent narrative, we take judicial notice of the court documents filed in father's direct appeal, case No. E076271. (Evid. Code, §§ 452, subd. (d), 453, & 459.)

[4] This appeal concerns I.R. only; reference to mother's other children will be as needed.

Clark County (Nevada) Child Protective Services (CPS) removed the children from her care and custody and initiated dependency proceedings. In 2016, CPS contacted N.T., father's sister who is a social worker for Los Angeles County, to obtain information about father. N.T. informed CPS that she was unaware that father "had an alleged child." Nonetheless, she said she "would be interested in caring for [I.R.] and his sibling." When she told father about I.R., father was "surprised."

In October 2016, the children were returned to mother's custody. Also, in late 2016, the San Bernardino County Department of Child Support Services (Department of Child Support) contacted father and directed him to "a county office where [his] DNA sample was collected" on December 7, 2016. Father was asked to report to the child support court every three months, "but when [he] went there [he] was directed to go to the child-support department offices."

### B. Current Dependency Action.

On November 5, 2017, the San Bernardino County Children and Family Services (CFS) removed I.R. and his half-siblings from mother's care, following the birth of her third child who tested positive for methamphetamine. Mother informed the social worker that each child has a different father, and no father has been involved in their lives. She refused to provide information regarding the fathers' identities.

### 1. The Petition and Detention Hearing.

On November 7, 2017, CFS filed a dependency petition under section 300, subdivisions (b) (failure to protect), (g) (no provision for support), and (j) (abuse of other sibling). The petition alleged mother suffered from a substance abuse problem, father

3

knew or should have known of mother's substance abuse issue, father's whereabouts were unknown, and mother's children were the subject of a 2014 dependency in Nevada. At the detention hearing, the juvenile court questioned mother about the paternity of her children. She identified father as the only possible father for I.R., but admitted that he was not on the birth certificate, she never married him, and she never sought child support from him. The court further inquired about father's whereabouts, but mother stated she had not had any "contact with him since [the child] was born" five years earlier, and she does not talk to his family. The court ordered mother to cooperate with the social worker in order to obtain information about his whereabouts and how to contact him. The court detained the children and set a combined jurisdiction and disposition hearing.

    2. *The Jurisdiction/Disposition Report and Hearing.*

On November 14, 2017, an office assistant in the Search Unit of CFS contacted father via telephone. She notified him of the jurisdiction/disposition hearing date, time, location and the social worker's phone number. She confirmed his mailing address and mailed notice of the hearing, including a copy of the petition, to that address. In his declaration in support of his habeas petition, father acknowledges this conversation; however, he "did not know that [he] was supposed to attend the hearing," and he told the office assistance that he was "attending the child-support court." Father "tried to reach a juvenile-court social worker" to ask why I.R. "was not in the child-support court." The social worker who father spoke to "said that she had no information and would call [him]

4

back. [However, when he] checked back later with the children-services department, [he] was informed that she was not the assigned social worker."

In her declaration of due diligence, the CFS office assistant stated that forms JV-140 (Notification of Mailing Address), JV-505 (Statement Regarding Parentage), and ICWA-020 (Parental Notification of Indian Status) were mailed to father; however, it appears that the forms were not sent "certified mail return receipt requested."[5] (See § 316.2, subd. (b) ["each alleged father shall be provided notice at his last and usual place of abode by certified mail return receipt requested alleging that he is or could be the father of the child. The notice shall state that the child is the subject of proceedings under Section 300 and that the proceedings could result in the termination of parental rights and adoption of the child. Judicial Council form Paternity-Waiver of Rights (JV-505) shall be included with the notice."]; Cal. Rules of Court, rule 5.635(g) [requiring the juvenile court clerk to provide alleged parents with a copy of the petition, notice of the next scheduled hearing, and form JV-505].) The jurisdiction/disposition report filed two weeks later, on November 28, 2017, identified father as an alleged father and stated that

---

[5] The Declaration of Due Diligence specifically states: "Certified mail notice along with JV140, JV505 and ICWA020 was sent to one address. Notice is complete. Complies with WIC291/WIC316.1." It is unclear whether the JV-140, JV-505 and ICWA-020 forms were sent via certified mail or simply mailed. Although the record contains a Certified Mail Receipt, it is blank, other than the name and address of father and a date of November 15, 2017. There is no official postmark, nor any amount listed for the Certified Mail Fee, to confirm the mailing. Also, father's declaration states: "I have been informed that the departmental employee who contacted me in November 2017 reported sending me a JV-505 form. During my appeal in this case, my appellate counsel provided me with a JV-505 form; before he did so, I do not recall ever having seen or heard of it. Had I received the form during the juvenile-court proceedings, I would have indicated on it that I wished to be adjudged [I.R.'s] father."

5

he was not interviewed "as [his] whereabouts are unknown at this time." The report also stated that the social worker "did not have enough identifying information to search criminal history for" father. The report was signed by the social worker on November 27, 2017, the same day CFS filed its office assistant's declaration of due diligence stating that she had spoken to father by phone on November 14, 2017, and verified his address.[6]

On November 29, 2017, the juvenile court continued the jurisdiction/disposition hearing to December 14. CFS failed to notify father of the continued hearing date. On December 14, the court found that "reasonably diligent efforts were made in attempting to locate [I.R.'s] absent parent and these efforts were unsuccessful." The court found father to be an alleged father not entitled to reunification services and set the six-month review hearing for June 14, 2018. CFS failed to notify father about the six-month review hearing either.

Based on I.R.'s DNA sample—taken on January 30, 2018—father's paternity was confirmed on February 12, 2018. In May 2018 the Department of Child Support initiated a case against father.

---

[6] The juvenile court was provided conflicting evidence as to whether CFS was aware of father's whereabouts. While the jurisdiction/disposition report stated that his whereabouts were unknown, the declaration of due diligence stated that his address was verified. Nonetheless, the record is void of any evidence showing that the court clerk sent father a JV-505 form as required by Cal. Rules of Court, rule 5.635(g).

*3. The Six-month Review Report and Hearing.*

According to the six-month status report filed June 11, 2018, CFS stated that father's address and phone number were unknown, and no notice was sent to him. The social worker, Stephanie Avena, stated that she "has not had any communication with [father] nor [has he] contacted the department to inquire about [his child]." On June 14, 2018, the juvenile court continued family reunification services for mother and set a 12-month review hearing for December 14, 2018. Upon receiving confirmation of his paternity in June or July 2018, father "contacted a child-services departmental social worker who told [him] that [he] was going to the wrong court; the social worker said that they had been waiting for the DNA lab results."

*4. The 12-month Review Report and Hearing.*

On August 29, 2018, father contacted social worker Avena and informed her that he had "found out" he was I.R.'s father, he had never met the child, and he wanted to be a part of the child's life. Ms. Avena explained that he had not been offered reunification services and provided him with the "[c]ourt's contact information so that he could receive information about what steps to take." Father called the juvenile court clerk. According to Ms. Avena, father "stated that he understood" what she had told him; however, she "has yet to hear from [him]." In contrast, in his declaration father states that, prior to November 2018, he "called the social worker for visits with [I.R.] but was told that [he] would have to wait for a court order." On October 1, 2018, he filed the JV-140 form (Notification of Mailing Address) with the juvenile court and, on November 19, CFS sent notice of the 12-month review hearing to him. In the 12-month status review report filed

November 27, 2018, Ms. Avena referenced her contact with father, but again stated that his address and phone number were "Unknown." I.R. had been living with Mrs. S., a non-related family member, since November 6, 2017; however, her status was defined as "RFA Probationary."

At the November 29, 2018, hearing, father was present and Clark & Le, LLP,[7] was appointed to represent him. Father indicated he wanted to raise his status to presumed father. The juvenile court discussed father's paternity test results "off the record" with father's counsel Mark Oliver. On the record, the court explained, "[W]e are at a [section 366.21(f)] hearing and [father has] already been found to be an alleged father, so if he wanted to elevate his status he would need to file a [section] 388 [petition]. So you can talk with him privately about that." The court asked father to fill out a JV-140 form so the social worker would know how to notify him "of important events in the case." The court emphasized that his failure to appear for the hearings would allow the court to "proceed without" him and his "parental rights could be terminated."

The juvenile court acknowledged receipt of the 12-month status review report with a recommendation to "set a .26 and terminate the mother's services." In response to the court's statement that father was not receiving reunification services, Mr. Oliver stated, "My client is not but I would ask to set the matter or confirm the [section 366.21(f)] since it is to set a .26." After discussing mother's lack of progress on her case plan, the court proceeded to hear argument from parents' counsel regarding the setting of a section

---

[7] Four lawyers from Clark & Le, LLP, represented father at different times during the dependency.

366.26 hearing. Father's counsel objected, but offered no other argument. After finding that mother had not benefitted from services the court set the termination hearing for March 29, 2019, and advised father of his right to appeal the decision by filing a petition for extraordinary writ. After Mr. Oliver stated he had nothing further to argue, the court advised father as follows: "So, sir, the next court date is March 29th at 8:30. Make sure that you are here on that date. Judge Marshall may be asked to terminate your parental rights, so if you want to participate in that hearing, March 29th at 8:30. Your lawyer wants you here at 8:00; okay?" Father replied, "Understand." Father filed the JV-140 form—for a second time—and the ICWA-020 form (Parental Notification of Indian Status).{CT 268, 269-270} Father's counsel did not file a section 388 petition, request a continuance of the hearing, or seek an extraordinary writ.

5. *The First Section 366.26 Report Recommending "A Goal of Adoption."*

According to the section 366.26 report filed March 28, 2019, CFS recommended the permanent plan of adoption be modified to "permanent placement with a specific goal of adoption for the children" because more time was needed to locate an adoptive family. The social worker, Ms. Avena, attached father's paternity test results and stated that he "has not contacted the department to inquire about the child." In contrast, in his declaration father states that "[b]etween the November 2018 and March 2019 juvenile-court hearings, [he] tried to contact the social worker Ms. Avena but she never responded." On March 29, 2019, father and his counsel were present at the hearing. The juvenile court referenced father's paternity test and Mr. Oliver asked to be heard. Mr. Oliver stated, "[Father's] first appearance was [at the] last hearing, your Honor. I do

9

understand to change his status, at least with regard to services, we do need a [section] 388. We plan on filing that. [¶] Per speaking with county counsel, I have not run this by Minors' counsel, we would be willing to stipulate with the paternity test with him at least being bio so that he can start visiting [I.R.]. My understanding about the [recommendation] with regards to [I.R.] is PPLA, which would give us time to file a [section] 388." The court asked when father had last seen I.R. and he replied, "I've never met him." The court found father to be the biological father of I.R., refused to order visitation, but did "give authority for supervised visitation with [I.R.] when appropriate," found adoption is no longer appropriate, ordered the permanent plan of placement in foster care with a goal of adoption, and continued the matter to September 30, 2019. No section 388 petition was filed on father's behalf.[8]

6. *The Section 366.3 Report Recommending Adoption.*

On September 10, 2019, CFS notified father of its intent to change I.R.'s permanent plan. According to the section 366.3 post permanent plan status review report

---

[8] Father's appellate counsel contacted Mr. Oliver regarding the failure to file a section 388 petition and Mr. Oliver replied that "he offered to help file one but that [father] said he had his own lawyer. When [appellate counsel] pointed out that [Mr. Oliver's] law firm was still representing [father] throughout the dependency proceedings, Mr. Oliver [said] that he was thereafter transferred to a different courtroom and that [appellate counsel] would have to ask Joshua Moody, the firm's lawyer who appeared with [father] at the next hearing—on September 30, 2019, in Judge Marshall's courtroom—why no section 388 petition was filed." Appellate counsel emailed Mr. Moody, who responded on January 28, 2021, stating he checked his records, but has "no recollection of this client and [he does not] see anything about a 388." Appellate counsel also sent—to both Messrs. Oliver and Moody—letters seeking their input concerning how they handled father's representation, and appellate counsel included self-addressed, stamped envelopes for their replies. As of April 6, 2021, appellate counsel has not received any response.

filed September 24, 2019, CFS now recommended adoption for I.R. "with relatives [(the maternal aunt and her husband)] who are in the process of being approved." The social worker, Ms. Avena, claimed that I.R. had no visits with father because he "has not contacted the undersigned to request visitation . . . or inquire regarding the child's well-being," and I.R. "has not expressed an interest in visiting [father], as it appears the child does not know who [father] is." In response to Ms. Avena's claims, father declares that between March and September 2019, she told him "the juvenile court had to give visits and that they were not authorized. Then, in October 2019, she told [him] that [he] couldn't visit [I.R.] because [the child] was having trouble in school; she told [father] she would call but she didn't, and she never returned [his] calls."

On September 30, 2019, the juvenile court authorized supervised visitation between father and I.R. The plan remained foster care with a permanent plan of adoption. Father's sister (N.T.), in her declaration in support of father's habeas petition, states that she was present at the hearing and spoke with father's counsel, Mr. Moody. N.T. discussed father's right to file a section 388 petition but "[t]he attorney appeared bother[ed] and not interested in submitting to the court a 388 petition." Mr. Moody requested that N.T. be assessed for placement, and she submitted a "Family Find and ICWA Inquiry."

According to N.T.'s declaration, she called the social worker, Ms. Avena, following the September 30, 2019 hearing and again on October 2, leaving detailed messages. On October 2, 2019, Ms. Avena returned the calls and stated she "had not yet review[ed] the court hearing orders and was not sure of the new court orders" authorizing

11

visitation. N.T. asked Ms. Avena to "schedule a Child and Family Team (CFT) meeting for [father], to discuss what are [the] underlying needs and strengths and give him an opportunity to tell his side to [CFS]. However, [Ms. Avena] declined [because] she did not think it was necessary." Following this conversation, father was officially allowed supervised visitation with I.R.[9]

The section 366.3 post permanent plan report filed June 22, 2020, recommended a section 366.26 hearing be set to order adoption for I.R. I.R. had been living with Mrs. G., his maternal aunt, and her husband who had "received RFA clearance through New Life Foster Family Agency." Regarding father, the social worker, Ms. Avena, stated that she "has not had much contact with [him] however, [he] has maintained [consistent] visitation with [I.R.], as reported by the child's caregiver." Father's first in person visit with I.R. took place on December 22, 2019, and father continued to visit I.R. twice a month until Covid-19 required virtual visitation. According to Mrs. G., the child "has asked why he can see his father and not his mother." Mrs. G. and her husband expressed an interest in adopting I.R. and his three half-siblings. On June 30, 2020, father's counsel (Christopher Roa) agreed, via stipulation, to set the matter for a section 366.26 hearing on October 14, 2020, waived appearance, and agreed to allow the juvenile court to make findings and orders attached to the section 366.3 post permanent plan report. Mr. Roa objected to the proposed recommendation of adoption "without affirmative evidence," but he did not request a hearing or object to "going forward by Judge's decision."

---

[9] Mr. Moody informed the juvenile court that father had stated that he "had been visiting prior to June."

12

*7. The Second Section 366.26 Report and Hearing.*

On September 25, 2020, CFS requested an order allowing service of notice of the section 366.26 hearing to father via his attorneys of record. According to the Declaration of Due Diligence, "American Eagle attempted service on 09/08/2020 and was informed by the current resident that the Party does not reside at the stated address and is unknown." However, a CFS office assistant was able to "telephonically" notify father of the hearing date, time, location and the social worker's phone number. She further stated that father provided a physical address that was the same address American Eagle used for service. On September 28, 2020, the juvenile court ordered notice of the time and date of the section 366.26 hearing be made to father through his attorneys of record.

According to the section 366.26 report filed November 17, 2020, CFS recommended termination of parental rights and selection of a permanent plan of adoption. The social worker reported that I.R. "maintains contact with [father] via telephone about once a month. [And,] Mrs. G. reported that [father] also communicates with her in order to inquire about how [I.R.] is doing."

On December 14, 2020, father and his counsel, Walter Shaw, appeared at the section 366.26 hearing. Mr. Shaw did not object to receiving the reports into evidence; however, he stated, "On behalf of the father, I do want to inform the Court that it is aware that Father is – has been established as an alleged father, but Father does wish for me to object on his behalf regarding terminating the parental rights, and Father does believe that he has a strong bond with [I.R.]. [¶] He visits [I.R.] through the phone, talks, and believes that there is a strong connection between the two. Therefore, we are asking not

13

to terminate [father's] parental rights as to [I.R.], your Honor." The juvenile court terminated parental rights and ordered adoption as the permanent plan. The court noted I.R.'s preference for adoption.

## II. DISCUSSION

Father appealed and petitioned for a writ of habeas corpus. On April 21, 2021, this court ordered the petition be considered at the same time as the pending appeal. In his petition, father contends he was denied effective assistance of counsel because his attorneys did not attempt to establish father's status as a *Kelsey S.* father or seek a continuance of the 12-month review hearing to do so. On June 4, 2021, we issued an order to show cause (OSC) why father was not entitled to the relief requested. "Issuance of an OSC signifies the court's preliminary determination that the petitioner has pleaded sufficient facts that, if true, would entitle him to relief." (*People v. Duvall* (1995) 9 Cal.4th 464, 475.) CFS filed a return, and father filed a traverse. CFS argues that father's ineffective assistance of counsel claim fails because "the clear evidence as it existed at the time and as it exists today demonstrates that [he] cannot show that he qualifies as a *Kelsey S.* father." As we explain, we conclude father's petition has merit.

To prevail on a claim of ineffective assistance of counsel, father must demonstrate (1) his counsel did not act in a manner expected of reasonably competent attorneys; and (2) his counsel's deficient representation caused him prejudice. (*Strickland v. Washington* (1984) 466 U.S. 668, 688, 694; *In re Emilye A*. (1992) 9 Cal.App.4th 1695, 1711.) "We review the matter to determine whether it is reasonably probable that a result

14

more favorable to the appealing party would have been reached in the absence of the error." (*In re O.S.* (2002) 102 Cal.App.4th 1402, 1407 (*O.S.*).)

   A.  *General Legal Principles.*

   The juvenile dependency law is designed "to provide maximum safety and protection for children who are . . . being neglected . . . and to ensure the safety, protection, and physical and emotional well-being of children who are at risk of that harm." (§ 300.2.)  The juvenile court, therefore, may declare a child facing neglect to be a dependent of the court.  (§ 300.)  If the child is declared a dependent and removed from the parent's physical custody, child welfare and family reunification services must be offered until the court determines that the child may not be safely returned to the parent and parental rights must be terminated.  (*In re A.R.* (2021) 11 Cal.5th 234, 245 (*A.R.*).)

   "While terminating parental rights is sometimes necessary to secure the child's long-term welfare, it is a uniquely serious step—one widely recognized as ranking 'among the most severe forms of state action.'  [Citation.]  To guard against the risk that parental rights will be terminated in error, the Legislature has enacted several significant procedural protections.  [Citation.]  Two of those protections are central to the issue we confront in this case.  [¶]  The first protection is the right to [competent] counsel. . . .  [¶] The second procedural protection is the right of appeal. . . ."  (*A.R.*, *supra*, 11 Cal.5th at pp. 245-246; see §§ 317, 317.5, subd. (a).)  Although "claims of incompetent representation would delay the finality of dependency proceedings[,] . . . the child's interest in finality is not the only value to consider; the child also has an important interest in ensuring that [his] relationship with a parent is not erroneously severed

15

because of the incompetence of the parent's lawyer. . . . [However,] parents [must] act promptly in raising their claims." (*A.R.*, at p. 248.) "[H]abeas corpus petitions are recognized as proper vehicles for raising claims of ineffective assistance of counsel in dependency proceedings." (*In re Paul W.* (2007) 151 Cal.App.4th 37, 53.)

*B. Analysis.*

Father contends his appointed counsel was ineffective by not attempting to establish father's status as a *Kelsey S.* father or seek a continuance of the 12-month review hearing to do so. We agree.

"[I]n dependency proceedings, time is of the essence." (*O.S.*, *supra*, 102 Cal.App.4th at p. 1409.) Here, at the 12-month status review hearing when father made his first appearance, and less than five months after he learned that he was I.R.'s biological father, counsel informed the juvenile court that father wanted to "elevate his status," and the court stated that "he would need to file a [section] 388 [petition]." However, counsel never filed a section 388 petition seeking such change and never requested a continuance of the hearing to do so. At most, counsel acknowledged a plan of filing a section 388 petition.

"In a dependency case, 'a man's status as a presumed or biological father is critical to whether he retains his rights to his child.' [Citations.] A presumed father is one who 'receives the child into [the parent's] home and openly holds out the child as [the parent's] natural child.' [Citations.] A biological father is one who has established his paternity but has not established his qualification as a presumed parent. [Citation.] An alleged father has established neither biological nor presumed father status.

16

[Citation.] Alleged fathers have 'fewer rights' and, unlike presumed fathers, 'are not entitled to custody, reunification services, or visitation.' [Citations.] A court may order reunification services for biological fathers if they are in the child's best interest but may not do so for alleged fathers." (*In re J.W.-P.* (2020) 54 Cal.App.5th 298, 300-301.)

In some circumstances, the child's mother or a third party may prevent the purported father from satisfying the factual grounds required for "presumed father" status. (*Kelsey S.*, *supra*, 1 Cal.4th at p. 847.) "[A]n unwed biological father who comes forward at the first opportunity to assert his parental rights after learning of his child's existence, but has been prevented from becoming a statutorily presumed father under [Family Code] section 7611 by the unilateral conduct of the child's mother or a third party's interference" acquires a status "equivalent to presumed parent status under [Family Code] section 7611." (*In re M.C.* (2011) 195 Cal.App.4th 197, 213, 220, superseded by statute on other grounds as stated in *C.A. v. C.P.* (2018) 29 Cal.App.5th 27, 35.) Thus, an unwed man may have a constitutional right to presumed father status if he "promptly comes forward and demonstrates a full commitment to his parental responsibilities—emotional, financial, and otherwise." (*Kelsey S.*, at p. 849.) This form of presumed father status is referred to as a *Kelsey S.* father. Here, counsel's failure to file a section 388 petition requesting *Kelsey S.* father status or request a continuance of the 12-month status review hearing denied father any reasonable opportunity to establish his case.

CFS appears to concede the first prong of the analysis. In its return, CFS does not address the merits of counsel's competency, but argues that father cannot establish

17

prejudice because the record "clearly reflects that [he] would not have qualified as a *Kelsey S.* father." In support of this argument, CFS points to the following facts: (1) in 2016, father "was able to provide the name of [I.R.'s] Mother to [his sister]"; (2) the JV-505 form and other relevant documents were sent certified mail "to the address provided by Father in El Monte, California," on November 15, 2017; (3) father contacted the social worker "for the first time on August 29, 2018" even though he had learned the results of the paternity test in June or July 2018, and (4) after the juvenile court declared father to be I.R.'s biological father on March 29, 2019, he never contacted the social worker regarding visitation. Relying upon these facts, CFS maintains that father "stood by as a passive observer while [I.R.] was the subject of two separate dependencies in two separate states" and thus failed to "demonstrate a commitment to the child prior to birth, following birth, [or] . . . after he claims he learned of the child's existence." We disagree.

To begin with, CFS misrepresents the record by claiming that father "was able to provide the name of [I.R.'s] Mother to [his sister, N.T.,]" in 2016. According to N.T.'s declaration, a Nevada case worker called her in 2016 to gather information regarding the whereabouts of father in order to determine whether he (father) "had any knowledge" about I.R. After speaking with the case worker, N.T. contacted father. Her declaration specifically provides, "I reach[ed] out to my brother, [Y.T.] and mention[ed] to him about the CPS worker and a child by the name of [I.R.] if he had any knowledge whether he was the father of this child. My brother [Y.T.] was not aware as he was surprised with the information, however, a couple days after my first telephone contact with the CPS worker he called me back and was able to provide the name of the mother. [¶] The CPS

18

worker stated that he briefly mention[ed] to the mother my name or who I was, but that she stated that she had no idea who I was. I then spoke with my brother [Y.T.] once again and mention[ed] to him the mother's name and he stated that he does recall her and that it was a one night stand." Contrary to CFS's representation of N.T.'s declaration, the CPS case worker provided mother's name, not father.

Although CFS asserts that it sent the JV-505 form via certified mail to father, he declares that if he had "received the form during the juvenile-court proceedings, [he] would have indicated on it that [he] wished to be adjudged [I.R.'s] father." As previously noted, there is insufficient evidence in the record that CFS mailed the JV-505 form to father via certified mail.[10] (See, *ante*, fn. 5.) Moreover, there is no evidence the juvenile court clerk provided father with the form either, by mail or when he first appeared in court. (See, *ante*, fn. 6.)

While CFS claims that father failed to demonstrate a prompt commitment to his parental responsibilities as evidenced by his failure to contact the social worker until August 29, 2018—two months after learning the results of the paternity test—and his failure to contact her between March 29 and September 30, 2019, in order to arrange visitation, the record belies this claim. Once he learned about I.R.'s existence, father

---

[10] Father contends he never received this crucial statutory notice advising him of the process for elevating his status from alleged father, along with the consequences of not doing so. CFS disagrees. Father's counsel was deficient in failing to ascertain whether father had received the JV-505 form because "[t]he court's '[f]ailure to provide the statutory notice denie[s]' an alleged father 'adequate notice of his rights and the ability to access the procedure for establishing paternity, obtaining reunification services, and ultimately seeking placement of his [child] in his home or with one of his relatives.'" (*In re J.W.-P.*, *supra*, 54 Cal.App.5th at pp. 306-307.)

19

submitted a DNA sample in December 2016, and proceeded to establish a biological connection prior to this dependency. He declares that he was "asked every three months to report to the child-support court, but when [he] went there [he] was directed to go to the child-support department offices. It was not until May 2018 that that department formally initiated a child-support case against [him]." In June or July 2018, upon receiving confirmation of his paternity, father "contacted a child-services departmental social worker who told [him] that [he] was going to the wrong court; the social worker said that they had been waiting for the DNA lab results." Father declares he contacted social worker Avena on August 29, 2018, and she offered nothing more than the juvenile court's contact information. He continued to call Ms. Avena about visitation with I.R., but she said that he would have to wait for a court order. At father's first court appearance, his counsel did nothing to elevate father's parental status; counsel neither requested that father be declared a *Kelsey S.* father—via a section 388 petition—nor argued for a continuance to file such petition. According to the record, father did "promptly come[] forward and demonstrate[] a full commitment to his parental responsibilities—emotional, financial, and otherwise." (*Kelsey S.*, *supra*, 1 Cal.4th at p. 849.)

Contrary to CFS's assertion, we conclude that "it is reasonably probable that a result more favorable to the appealing party would have been reached" if counsel had provided adequate representation. (*O.S.*, *supra*, 102 Cal.App.4th at p. 1407.) The evidence shows that mother never told father about I.R., but when father learned about the child's existence, he submitted a DNA sample in December 2016 and maintained

20

contact with the Department of Child Support. In November 2017, father received a call regarding the initiation of this dependency action; however, the evidence is unclear whether CFS sent the JV-505 form "certified mail return receipt requested," and there is no evidence the form was sent by the court. I.R.'s DNA test was conducted in January 2018 and father's paternity was confirmed the next month, but CFS never contacted father regarding the paternity results. Rather, he contacted social worker Avena after learning that he was I.R.'s biological father, and attempted to obtain care and custody of I.R. While father had not attended the jurisdiction/disposition or six-month review hearings, he had been attending child-support court appointments since 2016.

By the time of father's first dependency court appearance, he was represented by counsel who informed the juvenile court that father wanted to elevate his paternity status. The court indicated the need to file a section 388 petition; yet, counsel failed to file one prior to termination of reunification services or request a continuance of the hearing to do so. Because of counsel's nonaction, the court terminated reunification services and set a section 366.26 hearing. Had father's counsel acted competently, it is reasonably probable that the juvenile court would have found father qualified as a *Kelsey S.* father. Thus, he was prejudiced. (See *In re Marilyn H.* (1993) 5 Cal.4th 295, 309 ["Once reunification services are ordered terminated, the focus shifts to the needs of the child for permanency and stability."].) As a result, the judgment and the disposition order must be vacated.

Father has also filed an appeal in which he asserts the same issues. However, because we grant his petition for writ of habeas corpus we dismiss the appeal as moot by separate order. (*S.O.*, *supra*, 102 Cal.App.4th at p. 1412.)

## III. DISPOSITION

The petition for writ of habeas corpus is granted. The juvenile court shall (1) vacate the order terminating father's parental rights to I.R., (2) appoint new counsel for father, and (3) hold a new dispositional hearing as to father only, at which time father should be allowed an opportunity to establish himself as a *Kelsey S.*, or presumed father. If father is unable to establish himself as a *Kelsey S.*, or presumed father, then the court may immediately enter a new order terminating his parental rights. The appeal is dismissed as moot by separate order.

This court finds the firm Clark & Le, LLP, provided incompetent representation to father during a period where he was represented by Mark Oliver, resulting in the vacation of the order terminating father's parental rights and the need for a new dispositional hearing. Therefore, pursuant to Business and Professions Code section 6086.7, subdivision (a)(2) ["(a) A court shall notify the State Bar of any of the following: . . . [¶] (2) Whenever a modification or reversal of a judgment in a judicial proceeding is based in whole or in part on the misconduct, incompetent representation, or willful misrepresentation of an attorney"], the clerk of this court is ordered to forward a copy of this opinion to the State Bar upon issuance of the remittitur. At the same time, also pursuant to Business and Professions Code section 6086.7, subdivision (b) ["(b) In the event of a notification made under subdivision (a) the court shall also notify the attorney

22

involved that the matter has been referred to the State Bar"], the clerk of this court shall also notify Clark & Le, LLP, that the matter has been referred to the State Bar.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

McKINSTER
J.

We concur:

RAMIREZ
P. J.

RAPHAEL
J.